**MUCKLESHOOT INDIAN TRIBE, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

City of Seattle, Respondent–Intervenor.

No. 91–70519.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 1, 1993.

Decided May 19, 1993.

Robert L. Otsea, Jr., Office of the Tribal Atty., Muckleshoot Indian Tribe, Auburn, WA, for petitioner.

Randolph Lee Elliott, F.E.R.C., Washington, DC, for respondent.

Brian Faller, Asst. City Atty., Seattle, WA, for respondent-intervenor.

Before: WRIGHT, CANBY and REINHARDT, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

We consider whether the Cedar River is navigable within the meaning of the Federal Power Act, 16 U.S.C. §§ 791–825r (1988), thereby giving the Federal Energy Regulatory Commission licensing jurisdiction over Seattle's Cedar Falls Project. Presently, this city-owned hydroelectric project operates

without a federal license. The Muckleshoot Indian Tribe appeals FERC's finding that it lacks licensing jurisdiction under 16 U.S.C. §§ 797(e) and 817(1) because the river is nonnavigable. We have jurisdiction of FERC's final order under 16 U.S.C. § 825l(b). We affirm.

## FACTS AND PROCEEDINGS BELOW

The Cedar River is entirely in Washington.[1] It rises in the Cascade Mountains and flows in a general west-northwesterly direction into Chester Morse Lake where the Cedar Falls Hydroelectric Project is located. The project consists of a concrete overflow dike, which impounds Chester Morse Lake. The Cedar Masonry Dam is located 4,000 feet downstream from the dike and impounds a reservoir. Below Chester Morse Lake, the river falls 600 feet in the three miles to Cedar Falls. The river next passes the Town of Landsburg and the City of Renton and flows into Lake Washington. The lake is connected to Puget Sound and the Pacific Ocean by way of the Lake Washington Ship Canal and the Hiram M. Chittenden Locks.

For ease of reference, we divide the river into three segments: (1) the lower segment, from the river's mouth at Lake Washington upstream 19 miles to Landsburg; (2) the middle segment, where the project is located, from Landsburg upstream 21 miles to the upper end of Chester Morse Lake; and (3) the upper segment, from the upper end of the lake upstream 10 to 15 miles to the river's headwaters. This appeal focuses on the navigability of the river's middle segment.

In 1986, the Tribe and the Department of the Interior requested that FERC investigate whether the project required licensing under the Act. The Tribe maintained that the construction and operation of the project had negatively affected the river's anadromous fish. The Tribe contended that under federal licensing standards, the fish production would improve.

Director Springer, of the Office of Hydropower Licensing, found that the project was subject to FERC's mandatory licensing jurisdiction under § 817(1). City of Seattle, 43 FERC ¶ 62,124 (1988). He ruled that the project was located on a navigable waterway of the United States and ordered Seattle, as owner and operator, to obtain a license or an exemption for the project's continued operation. Seattle appealed, and the Tribe moved to intervene.

In November 1990, FERC granted Seattle's appeal and reversed the director's order. City of Seattle, 53 FERC ¶ 61,237 (1990). It held that the portion of the Cedar River on which the project was located was a nonnavigable waterway. The Tribe and Interior exhausted their administrative remedies, and the Tribe now appeals FERC's ruling of nonnavigability.

## ANALYSIS

### 1. FERC's Finding of Nonnavigability

The Tribe makes several arguments. First, it contends that FERC erred when it held that the river did not form a "continuous highway" of interstate commerce. The Tribe argues that the river is navigable because it had been used and was susceptible of use for interstate commerce. Second, the Tribe maintains that the river's middle section qualifies as a "mere interruption" of navigability for purposes of § 796(8).

■ We review FERC decisions to determine whether they are "arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or not in accordance with law." The Steamboaters v. FERC, 759 F.2d 1382, 1388 (9th Cir.1985). "We show great deference to [FERC's] interpretation of the law which it is charged with administering." Id. (citation omitted). We review FERC's finding of nonnavigability for substantial evidence. City of Centralia v. FERC, 851 F.2d 278, 281 (9th Cir.1988). If supported by substantial evidence and not contrary to law, FERC's finding is conclusive. § 825l(b).

### a. Standard for Navigability; Application

■ Section 817(1) provides that hydroelectric power projects "across, along or in any of the navigable waters of the United States" must be licensed by FERC. Naviga-

---

1. A map of the Cedar River is attached as Appendix A.

bility under § 796(8) requires a river to be suitable, currently or in the past, for transportation of property or persons between states. The river may be deemed navigable in its natural or improved condition. *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 406, 61 S.Ct. 291, 298, 85 L.Ed. 243 (1940). Also, navigability may still exist despite falls and other mere "interruptions between the navigable parts of such streams." § 796(8).

■ The Supreme Court set forth the Commerce Clause standard for navigable waters in *The Daniel Ball,* 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870). The Court held that a river is navigable in law when it is navigable in fact. Rivers are navigable in fact "when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes ... on water." *Id.* at 563. Rivers are navigable waters for interstate commerce purposes "when they form in their ordinary condition by themselves, or by uniting with other waters, a *continued highway* over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." *Id.* (emphasis added). FERC applied these principles properly when it considered relevant evidence to make its finding of nonnavigability.

The Tribe contends that evidence of heavy logging activity around Chester Morse Lake indicates that the river's middle section was used to transport lumber for interstate commerce. The Tribe relies mostly on a navigability report prepared for the Office of Hydropower Licensing that FERC considered in its determination.

Although the report found evidence of logging during the turn of this century around Landsburg and Cedar Falls, it noted that "roads and railroads, rather than the Cedar River, appear to have served as the primary means of transport for the logs." While the report states that "it is possible" that the Cedar River may have been used to move logs downstream when its waters allowed, it found no evidence of such practice. The report concluded that "the river was probably not an important avenue of transportation for logs, particularly in the turbulent stretch from the Crib Dam down to Cedar Falls."

The report also discusses a 1913 logging contract that permitted a local company to harvest all timber in the area that ultimately would be submerged by the lake's rising waters. The company agreed to transport the harvested logs on the city-owned railroad, which terminated at the Masonry Dam. From there, logs "were rafted from around the periphery of the lake to [an unnamed] bay and then loaded into railway cars."

FERC specifically held that the lake's logging activities did not support a "finding of navigability" as to the entire river. "The described activity appears to have been confined to the lake, and there is no record of any logs being floated downstream beyond the Masonry Dam, or in the 11–mile stretch of river between the powerhouse and Landsburg." FERC declined to infer otherwise absent substantial evidence.

In its order denying a rehearing, FERC relied on our holding in *Sierra Pacific Power Co. v. FERC,* 681 F.2d 1134 (9th Cir.1982), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1769, 76 L.Ed.2d 343 (1983). There, we rejected an agency finding of navigability for lack of evidence that the lumber industry had made commercial use of the section of a river that flowed across the border between two states. *Id.* 681 F.2d at 1139.

Here, too, the navigability report fails to show that harvested lumber was portaged around the dam and shipped downstream on its journey in interstate commerce. FERC emphasized that its finding was "squarely based on the lack of substantial evidence of use of the river from the project site to its mouth as part of a continuous highway of interstate commerce by water." We find no error in FERC's decision.

■ The Tribe argues that other substantial evidence demonstrated that the river had been used and was suitable for interstate commerce. "[O]nce found to be navigable, a waterway remains so" for purposes of the Act. *Appalachian Elec. Power Co.,* 311 U.S. at 408, 61 S.Ct. at 299. A lengthy absence of use caused by changed conditions or the advent of modern transportation "does not

affect the navigability of rivers in the constitutional sense." *Id.* at 409–10, 61 S.Ct. at 300.

The Tribe relies on a 1977 raft trip by the Washington Department of Fisheries between the powerhouse and Landsburg.[2] We consider "[u]se of private boats [as] relevant evidence [that] may demonstrate similar types of commercial navigation." *City of Centralia*, 851 F.2d at 282. According to FERC, this rafting attempt was unsuccessful. The raft capsized in a turbulent stretch and was recovered downstream. Because of the water's shallowness in areas, the rafters had to wade downstream and pull the craft alongside them. FERC concluded that evidence of this difficult trip was not sufficient to show that the middle segment was navigable.[3]

 Next, the Tribe relies on several historical excerpts taken from a 1962 Renton Public Library navigability reference file report. The report records interviews with persons who recalled seeing shingle bolt floats[4] on the river and transportation by Indian canoe. Evidence of shingle bolt drives can support a finding of navigability. *Puget Power*, 644 F.2d at 789. *But see Oregon v. Riverfront Protection Ass'n*, 672 F.2d 792, 794–95 (9th Cir.1982) (distinguishing *Puget Power* facts and clarifying that evidence of transporting logs by river sufficient when joined with other facts to support finding of navigability). The use of the river need not be "extensive, or long and continuous." *See Puget Power*, 644 F.2d at 789. The evidence also need not be overwhelming as "[u]se of a stream long abandoned by water commerce is difficult to prove by abundant evidence." *Id.* (quoting *Appalachian*

*Elec. Power Co.*, 311 U.S. at 416, 61 S.Ct. at 303).

Three longtime residents talked about shingle bolt drives and Indian canoeing, but the extent and location of these activities remains uncertain. Mrs. Cavanugh remembered log and shingle bolt drives on the Cedar from fall until spring. Also, her father-in-law told her about Indian canoes on the river. Likewise, Mr. Gruenes recalled shingle bolts floating downstream several times and had heard of Indians coming up the river by canoe. He remembered that the railroad, however, was the major means of transportation out of the area. Mr. Mason described shingle bolt floats and remembered Indians on the river, but he too confirmed that once milled, lumber was shipped out by railroad.

The amount and reliability of this past use evidence pales in comparison to the navigability evidence we found determinative in similar cases.[5] For example, in *Puget Power*, 644 F.2d at 788, we held that the river was navigable based upon downstream flotation of shingle bolts. The evidence included the testimony of ten witnesses and twelve photographs of shingle bolt drives. The evidence showed that shingle bolts moved downstream year-round for more than 20 years. *Id.* at 788.

In contrast, the Tribe's evidence of canoeing and shingle bolts does not indicate that commerce occurred on the river's disputed middle segment. Taken as a whole, this evidence does not specify where commerce occurred, and the Tribe does not furnish this information. A finding of navigability for the

---

**2.** This expedition is distinguishable from a canoe race considered in the latest case on this issue. In *Consolidated Hydro Inc. v. FERC*, 968 F.2d 1258 (D.C.Cir.1992), a lengthy 1973 canoe race that included a brief portage around a hydroelectric site, along with findings of the river's historical use for commercial navigation, provided substantial evidence of navigability. *Id.* at 1260–61. In contrast, the Tribe presents no evidence of portage around interruptions for commercial use. Rather, it draws inferences of such use.

**3.** FERC also mentions a 1986 attempt by the state game department to launch a boat for disbursing steelhead fry in the river's middle section. The boat, designed for use in extreme

adverse conditions, was severely battered by boulder rapids and removed about a mile from where it was launched.

**4.** Generally, shingle bolts are quartered sections of cedar logs and used for making shingles. *See Puget Power Sound & Light v. FERC*, 644 F.2d 785, 788 (9th Cir.), *cert. denied*, 454 U.S. 1053, 102 S.Ct. 596, 70 L.Ed.2d 588 (1981).

**5.** The evidence here is also insignificant in comparison to the historical evidence of repeated and substantial use of New York's Salmon River, held to be navigable in *State ex rel. New York State Dep't of Environmental Conservation v. FERC*, 954 F.2d 56, 61–62 (2nd Cir.1992).

middle segment may not be based on inferences of actual use elsewhere on the river.

### b. Middle Segment as a "Mere Interruption"

The Tribe argues that FERC erred by finding that the stretch between Landsburg and the lower portion of Chester Morse Lake was not a mere interruption between the lake and the river segment below. FERC stated

> [T]he manifest unsuitability for navigation of this lengthy stretch of the river['s middle segment], combined with the lack of substantial evidence that it was ever used for navigation (or portaged around), leads one to the conclusion that the *river as a whole* is not and *was not a continuous highway* for interstate commerce.

City of Seattle, 55 FERC ¶ 61,511 (1991) (emphasis added).

■ Under § 796(8), a stream may retain its navigable character despite the presence of nonnavigable interruptions such as falls, rapids, sand bars, carries or shifting currents that require portaging or "land carriage" to circumvent them. The Supreme Court has held that interruptions are simply factors to consider. *United States v. Utah,* 283 U.S. 64, 86, 51 S.Ct. 438, 444, 75 L.Ed. 844 (1931).[6] "[T]he vital and essential point is whether the natural navigation of the river is such that it affords a channel for useful commerce." *Id.; see Puget Power,* 644 F.2d at 789 ("[n]avigability depends upon the stream's usefulness as a transportation mechanism for commerce").

■ The Tribe admitted in its brief that it lacked direct evidence of actual or substantial use of the middle segment for interstate commerce. In addition, the very length of the middle section relative to the length of the river as a whole (21 miles out of, at most, 55) raises a presumption that this difficult stretch of river is not simply a "mere interruption" but, rather, renders the river unsuitable for navigation. For these reasons, we

hold that FERC correctly declined to infer that this segment had ever been circumvented or was suitable for use in interstate commerce.

### 2. The 1864 Washington Territorial Statute

The Tribe claims that an 1864 Washington territorial statute "explicitly demonstrates" that the river's middle segment was suitable for commerce.[7] The Tribe did not raise this argument before FERC. Generally, parties must raise objections to agency proceedings during the actual proceeding. *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 36–37, 73 S.Ct. 67, 68–69, 97 L.Ed. 54 (1952).

■ Under § 825*l*(b), we can consider an objection not raised before FERC only if the party offers reasonable grounds for failing to object. *Pacific Power & Light Co. v. FPC,* 141 F.2d 602, 605 (9th Cir.1944) (no review unless objecting party raised "the specific grounds of objection" before Commission).

■ The Tribe offers no reasonable grounds for its failure to present this 1864 statute. It contends that the statute is a law and not "new documentary evidence." However, the Tribe attempts to use it to supplement evidence of navigability. Further, we may consider new evidence only after the offering party has obtained our permission to allow FERC to reexamine its findings in light of the new evidence. § 825*l*(b). The Tribe has made no such request. We need not consider the 1864 statute.

### 3. Attorney Fees Under the Equal Access to Justice Act

Because the Tribe is not the prevailing party, we may not award reasonable attorney fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A) (1988).

---

6. *United States v. Utah* involved application of *The Daniel Ball* test to determine navigability for the purpose of establishing title to riverbeds. Although navigability for purposes of title differs in some respects from navigability for purposes of FERC jurisdiction, *see Riverfront Protection Ass'n,* 672 F.2d at 794 n. 1, the differences are of no consequence in this case.

7. The statute authorized a company to clear log jams and obstructions from the mouth of the Cedar River to a point near Landsburg "with the privilege of continuing the clearing of said river of obstructions for such further distance as said company may deem advisable." 1863–64 Wash. Terr.Laws 98, 99.

## CONCLUSION

The portion of the Cedar River on which Seattle's Cedar Falls Project lies is not a navigable waterway of the United States because it is not a continuous highway for interstate commerce purposes. The Tribe has produced no evidence that the 21–mile stretch of the river's middle segment was ever portaged around. Evidence of rafting, canoeing and shingle bolt floats in this case is scant and none is offered with respect to the segment of the river in dispute. There is substantial evidence to support FERC's finding of nonnavigability.

**AFFIRMED.**

## Appendix A