**HIGH COUNTRY RESOURCES and Glacier Energy Company, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 99–70747.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 14, 2001

Filed June 21, 2001

Kurt A. Denke, Seattle, Washington, for the petitioners.

Laura J. Vallance, Federal Energy Regulatory Commission, Washington, D.C., for the respondent.

Before: REINHARDT, WARDLAW, and GOULD, Circuit Judges.

Opinion by Judge WARDLAW:
Concurrence by Judge REINHARDT;
Partial Concurrence and Partial Dissent by Judge RONALD M. GOULD.

WARDLAW, Circuit Judge:

High County Resources ("HCR") and Glacier Energy Company ("Glacier") (collectively "Petitioners") petition for review of two Federal Energy Regulatory Commission ("FERC") orders dismissing their license applications for hydroelectric pro-jects on tributaries of the Skagit River. The orders were based on a 1998 United States Forest Service determination ("1998 determination") that the projects would unreasonably diminish the fishery value of the Skagit Wild and Scenic River Area in violation of Section 7(a) of the Wild and Scenic Rivers Act (" § 7(a)"), *codified in* 16 U.S.C. § 1278. In light of the 1998 determination, FERC concluded that it could not license the proposed projects, and dismissed Petitioners' applications. Petitioners challenge the orders on the ground that FERC's statutory construction of § 7(a) is flawed. Glacier also argues that FERC erred by relying on the 1998 determination instead of a previous § 7(a) determination prepared by the Forest Service in 1986 ("1986 determination").

We lack jurisdiction under 16 U.S.C. § 825*l*(b) to entertain Petitioners' statutory construction argument because it was neither raised in the administrative proceedings nor in the request for rehearing. We hold that FERC was not bound by the Forest Service's 1986 determination regarding the Diobsud Creek project. We therefore dismiss in part and deny in part the petition.

## I. Background

### A. Statutory Background

The Federal Power Act ("FPA") requires that a party seeking to construct, operate or maintain a hydroelectric power facility must obtain a license from FERC. *See* 16 U.S.C. § 817. FERC's authority to provide such licenses, however, is not unlimited. Section 7(a) of the Wild and Scenic Rivers Act,[1] 16 U.S.C. § 1278(a), provides that:

---

1. The Wild and Scenic Rivers Act protects and preserves certain rivers which, together with their immediate environments, "possess outstandingly remarkable scenic, recreation-al, geologic, fish and wildlife, historic, cultural or other similar values." 16 U.S.C. §§ 1271. Rivers are included in the national wild and scenic rivers system either by act of

[FERC] shall not license the construction of any ... project works under the [FPA] ... on or directly affecting any river which is designated ... as a component of the national wild and scenic rivers system ..., and no department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration.

Section 7(a) further states that:

Nothing contained in the foregoing sentence, however, shall preclude licensing of, or assistance to, developments below or above a wild, scenic or recreational river area or on any stream tributary thereto which will not invade the area or unreasonably diminish the scenic, recreational, and fish and wildlife values present in the area [at the time it was designated as a wild and scenic river area].

In 1978, Congress designated major portions of the Skagit River as part of the wild and scenic rivers system. 16 U.S.C. § 1274(a)(18). Because the Skagit River runs through the Mount Baker–Snoqualmie National Forest, the Secretary of Agriculture administers this particular wild and scenic river area through the Forest Service. *See* 36 C.F.R. § 200.1(c)(2).

**B. Factual and Procedural Background**

Between 1983 and 1990, seven parties, including Petitioners, filed license applications for eight hydropower projects in the Skagit River Basin.[2] The hydroelectric plants would use a small diversion structure, similar to a dam, to route portions of the stream through a pipeline, generating five megawatts of electric power. If licensed, the two projects relevant here— the Rocky Creek project and the Diobsud Creek project—would be constructed within the Mount Baker–Snoqualmie National Forest on tributaries of the Skagit River. Neither location falls within the boundaries of the Skagit Wild and Scenic River ("Skagit WSR").

In April 1998, FERC conducted a basin-wide analysis and published a Final Environmental Impact Statement ("FEIS"). In the FEIS, FERC recommended denying five of the eight applications, including those at issue here. *See* 87 F.E.R.C. ¶ 61,-123, 61,491 n.3, 1999 WL 251309 (1999).

Thereafter, the Forest Service prepared its 1998 determination in which it assessed whether any of the proposed projects might "invade" or "unreasonably diminish the scenic, fish and wildlife values" of the Skagit WSR. Relying on FERC's FEIS, the knowledge of the Forest Service staff, and other available data (including a 1995 Forest Service report on the slope stability risk analysis for Skagit River small hydropower projects), the Forest Service concluded that six of the eight projects— including Rocky Creek and Diobsud Creek—would "unreasonably diminish" the fishery value in the Skagit WSR. In particular, the Forest Service concluded that the projects risked sediment delivery which could affect vulnerable fish stocks. The Forest Service further determined that none of the proposed mitigation measures would bring the risk to an acceptable level.

---

Congress or an act of the legislature of the state or states through which the river flows. *See* 16 U.S.C. § 1273.

**2.** The Skagit River Basin is located in Skagit and Whatcom Counties in the State of Washington.

FERC considered both the Rocky Creek project and the Diobsud Creek project, among others, in its October 1998 Order. *See* 85 FERC P ¶ 61,093, 1998 WL (1998). Interpreting its authority under § 7(a) of the Rivers Act, FERC first explained that it was precluded from licensing:

> the construction of any project works (1) on or directly affecting any river which has been designated a component of the national wild and scenic rivers system, or (2) that would have a direct and adverse effect on the values for which such river was designated, as determined by the Secretary charged with its administration or (3) that would invade the area below or above a wild, scenic or recreational area or any stream tributary thereto or unreasonably diminish the scenic, recreational, and fish and wildlife values present in the area on the date of designation of a river as a component of the national wild and scenic rivers system.

*Id.* In light of the 1998 determination that the proposed projects would unreasonably diminish the Skagit WSR fishery value, FERC found that it lacked authority to license the construction of the Rocky Creek and Diobsud Creek projects and dismissed Petitioners' applications. *Id.*

Petitioners filed a request for rehearing on November 11, 1998. They first argued that FERC, not the Secretary of Agriculture, is the agency responsible for making determinations under the second sentence of § 7(a) of the Rivers Act. Petitioners also asserted that FERC could not rely on the 1998 Forest Service determination because it was made by the Regional Forester and was otherwise procedurally and substantively flawed. FERC considered these rehearing requests in its April 1999 Order denying the request for rehearing. *See* 87 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,123 (1999). FERC rejected Petition-

ers' first argument, holding that it was inconsistent both with the statutory scheme of the Rivers Act, which gives the Secretaries of the Interior and Agriculture the responsibility for managing and protecting the rivers, and with the legislative history of the Act, which makes clear that the authority for making a § 7(a) determination belongs to the Secretary administering the designated river in question. *See* 87 FERC at 61,491. FERC also rejected Petitioners' second argument, finding that FERC's role was not to judge the validity of another agency's practice or decision making. *See* 87 FERC at 61,492. Petitioners timely petitioned for review.

## II. Jurisdiction

We generally have jurisdiction to review final decisions of FERC under 16 U.S.C. § 825*l*(b), which provides:

> Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States Court of Appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part.

*Id.* Because Petitioners have their principal place of business in Washington, we would ordinarily have jurisdiction to hear a petition for review. However, § 825*l*(b) also provides that "[n]o objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless

there is reasonable ground for failure to do so." *Id.*

Petitioners argue for the first time on appeal that the second sentence of § 7(a) either provides an example of activities that are not precluded by the first sentence, or creates an exception to the general rules set forth in the first sentence.[3] FERC, on the other hand, interprets the second sentence as a third, independent standard that applies specifically to proposed developments outside of wild and scenic river areas. *See* 85 FERC ¶ 61,093.

■ Petitioners did not raise this statutory construction argument in the administrative proceedings or in the request for rehearing. In those proceedings, Petitioners argued that: (1) only FERC, and not the Secretary of Agriculture, is authorized under the second sentence of § 7(a) to make a determination; (2) the Commission's adoption of the Forest Service's interpretation violated several statutory provisions; and (3) the Forest Service's 1998 determination is barred by principles of res judicata. Petitioners did not object to FERC's statutory construction of § 7(a) in their original administrative proceedings before FERC or in their request for rehearing. Therefore, we lack jurisdiction to review Petitioners' first argument. *See Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC,* 962 F.2d 27, 34–35 (D.C.Cir.1992) ("[U]nder the

FPA's judicial review provision, 16 U.S.C. § 825*l* (b), [p]arties seeking review of FERC orders must petition for rehearing of those orders and must themselves raise in that petition all of the objections urged on appeal. Neither FERC nor this court has authority to waive these statutory requirements." (internal quotations and citations omitted)); *State of Cal. ex rel. State Water Res. Bd. v. FERC,* 877 F.2d 743, 745 (9th Cir.1989) (holding that under § 825*l* (b), "[o]ur jurisdiction is limited to objections raised in the petitioner's application for rehearing before the Commission").

Petitioners assert that they implicitly raised their statutory construction argument in their request for rehearing. Petitioners cite isolated language in their brief in support which reads: "[i]t is not clear that the second sentence of 1278(a) has any substantive content at all," and "[t]he second sentence grants no additional authority to the Secretary of Agriculture, and indeed does nothing other than to clarify the point that the Secretary may prohibit power development only in the case of a direct and adverse effect." Although this language taken out of context may suggest that the second sentence of § 7(a) is not "substantive in content," the entire gist of Petitioners' argument before FERC was that the Secretary of Agriculture lacked authority under the second sentence of § 7(a) to make a determina-

---

3. Section 7(a) states in its first sentence:
[FERC] shall not license the construction of any ... project works under the [FPA] ... on or directly affecting any river which is designated ... as a component of the national wild and scenic rivers system ..., and no department or agency of the United States shall assist by loan, grant, license or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration.

In its second sentence, § 7(a) states that:
Nothing contained in the foregoing sentence, however, shall preclude licensing of, or assistance to, developments below or above a wild, scenic or recreational river area or on any stream tributary thereto which will not invade the area or unreasonably diminish the scenic, recreational, and fish and wildlife values present in the area [at the time it was designated as a wild and scenic river area].

tion, precluding adoption by FERC of the Agriculture Secretary's determination; whereas, here, Petitioners advance the substantive argument that their proposed plants are permitted by the second sentence of § 7(a). These are not the same arguments simply because they both require interpretation of the same sentence. Put another way, our answer to one would not resolve the other.

Furthermore, we require much more specificity in the statement of objection in the administrative petition for rehearing to trigger our appellate review. *Am. Rivers v. FERC*, 201 F.3d 1186, 1193 (9th Cir. 1999) (noting that "[b]ecause the petitioners renew on this appeal the *specific objections* proffered in their administrative petitions for rehearing, this Court has jurisdiction pursuant to 16 U.S.C. § 825*l* (b)" (emphasis added)); *Pac. Power & Light Co. v. FPC*, 141 F.2d 602, 605 (9th Cir. 1944) (holding that this court lacks jurisdiction unless objecting party raised "the specific grounds of objection" before the Commission). There is good reason for this requirement. As the D.C. Circuit explained in *R.I. Consumers' Council v. FPC*, 504 F.2d 203, 212 (D.C.Cir.1974):

> The purpose of [the provision requiring the parties to raise all objections to FERC before appealing them to this court] is to insure that the Commission has an opportunity to deal with any difficulties presented by its action before the reviewing court intervenes. *FPC v. Colorado Interstate Gas Co.*, 348 U.S. 492, 75 S.Ct. 467, 99 L.Ed. 583 (1955). This exhaustion requirement comports with the general function of judicial review to insure that an agency has "taken a 'hard look' at the salient 'problems.'" *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C.Cir.1970). The agency cannot reasonably be expected to take a hard look unless the parties participate in the task of identifying the

hard problems, and of bringing to light pertinent information and analysis bearing on their resolution. The agency's obligation presupposes a burden on the part of interested parties to draw attention to the consequences of proposed action that adversely affects their interests.

By not presenting the issue squarely to FERC, Petitioners have deprived FERC of the opportunity to first address the interaction of the first and second sentences of § 7(a) before we intervene. Thus, Petitioners' argument fails.

Our analysis does not end here, however. "Under § 825*l*(b), we can consider an objection not raised before FERC ... if the party offers reasonable grounds for failing to object." *Muckleshoot Indian Tribe v. FERC*, 993 F.2d 1428, 1433 (9th Cir.1993). This exception has been limited to three situations: (1) where the objection was based upon changed circumstances; (2) where the Commission subsequently clarified its position; or (3) where the objection upon rehearing appeared futile. *See* Scott Jennings, *Requirement that Objection be Urged on Rehearing Before Federal Energy Regulatory Commission as Prerequisite for Judicial Review under § 19 of Natural Gas Act (15 U.S.C. § 717(r)), § 506(a) of the Natural Gas Policy Act (15 U.S.C. § 3416(a)) and § 313 of Federal Power Act (16 U.S.C. § 825l)* 93 A.L.R. Fed. 186, 1989 WL 571882 (1989).

Petitioners do not base their jurisdictional argument on the "changed circumstances" exception. Nor could they. There is no indication that since the order denying Petitioners' request for rehearing § 7(a) has been amended or cases have interpreted it differently or that the factual circumstances underlying FERC's decision have changed in any way. Second,

FERC has not since clarified its position or reinterpreted § 7(a). In fact, FERC interpreted § 7(a) as setting forth three separate standards in its opinion in the original licensing hearing, *see* 85 FERC at ¶ 61,093, thereby providing Petitioners with the opportunity to object to FERC's statutory construction of § 7(a). Finally, there is no suggestion that Petitioners' statutory objection upon rehearing would have been futile and there is nothing in the record to suggest that it might have been. Therefore, because the facts indicate that Petitioners do not fall within any of the exceptions to § 825*l*(b), we lack jurisdiction to review Petitioners' first claim.

## III. Binding Authority of the Previous Section 7(a) Determination

Because Petitioner Glacier raised its second argument in its request for rehearing, we have jurisdiction pursuant to 16 U.S.C. § 825*l* (b). In 1986, a regional forester determined under § 7(a) that, due to potential siltation, the proposed Diobsud Creek project would unreasonably diminish the fish and wildlife values of the Skagit WSR. Glacier, which applied for the Diobsud Creek license, appealed this determination to the Chief of the Forest Service. After reviewing the case, the Chief found that the adverse impacts from potential siltation could "be successfully mitigated by conditions in the license" and remanded for the purpose of, among other things, "determin[ing] the appropriate conditions ... necessary to prevent unacceptable impacts to the wild and scenic river." By its own terms, the Chief's decision was the final administrative determination of the Department of Agriculture.

Glacier contends that in light of the Chief's final decision (the "1986 determination"), the regional forester was barred from making the later, contrary 1998 determination, and that FERC therefore

erred in relying upon it. FERC counters that (1) it could not inquire into the validity of the Forest Service's internal decision making, and (2) the 1998 determination was not barred because the 1986 determination addressed a far more limited question (whether the Forest Service could withhold consent for the project simply because Glacier had refused to provide data).

■ Although Glacier makes a sympathetic pitch about the lengthy, complicated and often repetitive licensing process, it cites no relevant authority for its claim that the 1998 determination should be barred by principles of res judicata. The Restatement (Second) of Judgments 83 and the Supreme Court case, *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), upon which Glacier relies, address a very different situation than that presented here. First, Glacier's authorities concern agency decisions that are given res judicata effect by a court in a later proceeding. *See University of Tennessee,* 478 U.S. at 799, 106 S.Ct. 3220 (holding "that when a state agency 'acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts" (citation omitted) (alteration in original)). At issue here, however, are consecutive decisions reached within a single agency after new information came to light. Second, Glacier's authorities concern decisions reached in a forum with the essential procedural characteristics of a court proceeding. Here, the Forest Service appeal process which resulted in the first "final decision" arguably is not the equivalent of a court proceeding. *See* 36 C.F.R. § 211.18.

Moreover, Glacier's challenge to the 1998 determination should have been raised with the Forest Service, rather than FERC, and Glacier offers no reason why it did not or could not do so. *See Bangor Hydro–Elec. Co. v. FERC,* 78 F.3d 659, 663 (D.C.Cir.1996) (stating that it is "not [FERC's] role to judge the validity of [another agency's] position—substantially or procedurally").

Finally, it appears that the existence of new information gave the Forest Service good reason to reevaluate the 1986 determination. *Cf. Envtl. Def. Fund, Inc. v. EPA,* 510 F.2d 1292, 1299–1300 (D.C.Cir. 1975) (previous refusals to suspend registration of pesticide did not strip EPA of discretion to make a new decision based on a reevaluation of existing data and new information); *FTC v. Texaco, Inc.,* 555 F.2d 862, 893 (D.C.Cir.1977) (Leventhal, J., concurring) (observing that Federal Power Commission "would not [be] precluded from changing its mind" concerning an earlier decision).

## IV.  Conclusion

For the foregoing reasons, we lack jurisdiction to review Petitioners' first argument, and therefore dismiss without reaching its merits.[4]  We deny the petition to review Petitioners second argument.

DISMISSED in part, DENIED in part.

REINHARDT, Circuit Judge, concurring in the judgment:

I am inclined to agree with Judge Wardlaw that petitioners did not properly raise their statutory interpretation claim in their petition for rehearing of the Forest Service's determination on behalf of Secretary of Agriculture.  Whatever the outcome of that question, however, I would affirm FERC's determination because I believe that its findings complied with the statutory requirements.

Judge Wardlaw's opinion accurately states one of the disagreements between the parties: High Country believes that in interpreting the first two sentences of section 7(a) of the Wild and Scenic Rivers Act, the second sentence must be viewed as providing an exception to the first. FERC appears to interpret the second sentence as an independent and additional standard to be applied to proposed projects.  In this case the disagreement is of academic interest only and has no practical or legal consequence.

In the proceedings below, FERC, as it was required to do, simply adopted the determination of the U.S. Forest Service.[1] Thus, it is of no consequence which of the various interpretations of the two sentences of section 7(a) FERC may believe to be correct.  The standard to be applied by a federal agency, such as the Forest Service, in determining whether to assist a project, including whether to grant a license,[2] is whether that project would have a direct and adverse effect on the values for which that river was established.  As the second sentence of section 7(a) states, however, the Forest Service may assist a project that does not invade or unreasonably diminish those values for which the river was established.  It follows from a

---

**4.** If I were to reach the merits, I would be inclined to agree with the views expressed by Judge Reinhardt in his concurring opinion.

**1.** In rendering its decision, FERC noted that the Forest Service, on behalf of the Secretary of Agriculture, "has the authority to determine whether any of the proposals would

have a direct and adverse effect on the River." *See also Swanson Min. Corp. v. FERC,* 790 F.2d 96, 103 (9th Cir.1986).

**2.** Under section 7(a), such assistance includes the award of a license. *See* 16 U.S.C. § 1278(a).

careful reading of the two sentences that any project that does invade the river or that unreasonably diminishes certain of its values necessarily directly affects the river.[3] Here, FERC applied the correct statutory standard, because it deferred to a determination of the Forest Service that was based on findings that fully complied with the requirements of section 7(a).

The Secretary of Agriculture, acting on behalf of the Forest Service, found that there was sufficient likelihood of direct and adverse effects as to require it to refuse to license High Country's projects. For example, the Forest Service determined that the Rocky Creek project would "caus[e] significant *direct* and indirect *negative* effects" on the fish in that river (italics added). Furthermore, the Forest Service considered that the Diobsud Creek project would "potential[ly] . . . affect vulnerable fish stocks . . . in the Skagit WSR."[4]

However, the direct and adverse effects of the projects on the Skagit river were not the principal focus of the order—the Forest Service made that determination without much difficulty. The Forest Service described the initial question as to whether the proposed projects would "invade the designated Skagit WSR."[5] The report further described the first inquiry as determining "the potential for project-area effects to be of consequence in the Skagit WSR; specifically, to invade the area or affect its scenic, recreational, and

fish and wildlife values." Clearly, the term "affect" means "adversely affect" and not "positively affect." The report determines that the effect was "significant[]."

Having made the above determination, the Forest Service then moved on to what it considered to be "[t]he next question," which constituted its major concern. That was whether, given the direct and adverse effect on the Skagit, there was an *unreasonable* diminution in the river's fishery values. With respect to the two projects in question, the Forest Service specifically found that both projects would "unreasonably diminish the fishery value in the Skagit WSR" as a result of the invasion of the river and consequent diminution of the fish stock. On the basis of these findings, the Forest Service refused to recommend that High Country receive a license.

The inescapable conclusion is that the Forest Service found that there would be a direct, adverse effect on the river sufficient to satisfy the requirements of section 7(a). In reaching its determination, the Forest Service took into account the provision contained in the second sentence of that section and concluded that the limitations contained therein were inapplicable because the project would both invade the river and *unreasonably* diminish its fishery values. That finding was premised upon the proposed project's direct effect and its potential adverse impact on the river—that it would likely create sediment

---

3. A project invades or diminishes the river by, e.g., making it less scenic, less interesting to boat along or camp beside, or less habitable for animals or fish living in or near it. These are all direct effects of the project on the river.

4. Although the Forest Service's report does not explicitly state that the direct effect of the Diobsud Creek project on the river would also be adverse to the river, that is not the standard required for FERC to refuse to issue a licence. All that is needed under section 7(a)

is that the proposed project "directly affect[ ]" the river. There can be no question that the effect the report described is an adverse rather than a positive effect. While not a model of clarity, the Forest Service's findings are sufficient to meet the "direct effect" standard.

5. The Skagit WSR is described in the report as "the Skagit National Wild and Scenic River" which is "158.5 miles long including portions of the Skagit, Sauk, Cascade, and Suiattle Rivers within and outside the National Forest."

that would invade the river, and that such an invasion of sediment would diminish the fish stock. The finding is explicitly supplemented by the additional finding that the projects would *unreasonably* diminish the fishery values.[6] Thus, the provisions of the second sentence of 7(a) provide no benefit to petitioners in this instance, no matter how one reads the sub-section.

Under *Swanson,* FERC was bound to adopt the findings of the Forest Service. *See* 790 F.2d at 103. Because these findings comply with the requirements of section 7(a), I concur in the judgment.

RONALD M. GOULD, Circuit Judge, concurring in part and dissenting in part:

I concur in Part III of the majority opinion concerning the effect of the Forest Service's 1986 determination regarding the Diobsud Creek project. However, I respectfully dissent from Part II. There, the majority gives an unduly narrow reading to Petitioners' requests for rehearing before FERC, and thus incorrectly concludes that we have no jurisdiction to consider the statutory construction argument urged on appeal. I disagree, because this claim was adequately raised below.

In their rehearing requests, Petitioners made two arguments that are relevant here. First, they challenged the authority of the Secretary of Agriculture ("Secretary"), contending that the Secretary (acting here through the Forest Service) can make binding determinations only as to the criteria in the first sentence of § 7(a) (i.e., whether a project is "on or directly affecting" a wild and scenic river or will have "a direct and adverse effect on the values for which [a wild and scenic] river was established"), but not as to the second sentence (i.e., whether a project will "unreasonably diminish" certain values present in the wild and scenic river area).[1] Petitioners claimed that because the Forest Service's determination was phrased in terms of the second sentence under which the Secretary had no authority, the Forest Service's findings did not bind FERC. This argument failed below and was sensibly abandoned on appeal.

Second, Petitioners focused on the relationship between the first and second sentences of § 7(a). They argued that the second sentence consists of "clarifying language" and "is not substantive in content, but is designed to prevent overbroad interpretation of the first sentence." It is this argument that is before us on appeal, and I conclude properly to be considered. According to the majority, however, the claim was not preserved. The majority reasons: "[W]e require much more specificity in the statement of objection in the administrative petition for rehearing to trigger our appellate review." I respectfully disagree. The authorities cited by the majority do not support its conclusion. Those cases altogether fail to describe the degree of specificity required in an administrative petition; rather, they simply state the basic requirement that the "specific" objections raised on appeal must first be raised before the administrative entity.

Our cases point to the opposite conclusion than that asserted by the majority as a justification to decline review of the important issue before us. We previously

---

6. The Forest Service evaluated the likelihood of sediment delivery and the magnitude of its effect on the fish. It concluded that the likelihood of delivery and the magnitude of effect were so high that the projects would unreasonably diminish the fishery values of the Skagit river.

1. For the sake of brevity, I will refer to these provisions as "the first sentence" and "the second sentence."

have observed that the purpose of the relevant jurisdictional statute, 16 U.S.C. § 825*l*(b), is to give FERC "notice of its alleged errors so that it may have the opportunity to correct them." *Sierra Ass'n for Env't v. FERC*, 791 F.2d 1403, 1407 (9th Cir.1986) (internal quotation marks and citations omitted). That purpose was satisfied here. To be sure, Petitioners' argument regarding the effect of the second sentence was subsidiary to their contentions about the Secretary's authority, and could have been articulated more fully. But this is not to say that the argument was merely "isolated language," as the majority claims. Read fairly, Petitioners' rehearing requests provided notice to FERC of the same statutory construction argument advanced on appeal. FERC had ample opportunity to address this issue in its ruling, but chose not to do so. That FERC had prior notice of Petitioners' statutory construction argument is underscored by the fact that on appeal, FERC objected to various of Petitioners' arguments on the ground that they were not raised below; notably, the statutory construction argument was not one of them.

I see no legal basis to decline review of a federal agency's construction of a statute that defines the scope of the agency's power, when the issue was presented to the agency, albeit with less than perfect clarity, and where the agency itself concluded that the issue was raised in requests for rehearing. Further, there is no policy that encourages avoiding and deferring the issue of how the governing statute constrains FERC's power. The argument before us was previously before FERC, and that agency appears ready, willing, and able to join issue now. The public gains from a resolution of this statutory construction issue, particularly in an era where energy is increasingly scarce and federal agency decisions precluding licensing of new power generation facilities warrant scrutiny. Not only the public, but the agency itself suffers if we decline review on the merits and leave untouched an agency position that is erroneous as a matter of law.

"[F]ederal courts are vested with a 'virtually unflagging obligation' to exercise the jurisdiction given them." *McCarthy v. Madigan*, 503 U.S. 140, 146, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817–18, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 6 Wheat. 264, 19 U.S. 264, 404, 5 L.Ed. 257 (1821). In my view, the majority opinion creates an artificially high barrier to proper appellate review and, in so doing, fails to consider arguments properly before us.

Because I believe that we have jurisdiction, I would address the merits of Petitioners' argument. In brief, I would grant the petition; hold that FERC erred; and remand for further proceedings. This case turns on the interplay between the first and second sentences of § 7(a). There is no dispute about the first sentence. It sets forth two standards for evaluating license applications for hydroelectric projects that implicate the Wild and Scenic Rivers Act: (1) FERC cannot license any projects "on or directly affecting any [wild and scenic] river"; and (2) no department or agency of the United States, including FERC, can assist in the construction of any water resources project that would have "a direct and adverse effect on the values for which [a wild and scenic] river was established."

The dispute concerns the second sentence of § 7(a)—"Nothing contained in the

foregoing sentence ... shall preclude licensing of ... developments below or above a wild and scenic or recreational river area ... which will not invade the area or unreasonably diminish the scenic, recreational, and fish and wildlife values present in the area." FERC interprets this sentence as creating a third, independent standard that applies specifically to proposed developments outside of wild and scenic river areas. This strained construction is inconsistent with the plain language, purpose, and overall structure of § 7(a). The first sentence is not limited to projects within a wild and scenic river area, and the second sentence on its face reads as a clarification of the first.

Because the Forest Service's determination related only to the second sentence of § 7(a)—which has no independent substantive content—the determination was, in effect, a nullity. Stated another way, because the Forest Service did not determine that Petitioners' proposed projects were "on or directly affecting" the Skagit WSR, nor that the projects would have a "direct and adverse effect on the values for which [the Skagit WSR] was established," FERC was not bound by the Forest Service's decision. On this basis, I would grant the petition.

One other issue deserves attention. It is possible that the Forest Service's conclusion regarding the second sentence has necessary implications for the first. That is, the finding that the projects would "unreasonably diminish the values" for which the Skagit WSR was established might necessarily mean that the projects would "directly affect" the river. I would leave that decision to FERC in the first instance.

But what cannot be left to FERC is the power unilaterally to alter the governing standards for licensing and to depart from the carefully delineated standards that have been set by Congress. Because I believe that FERC has badly misinterpreted § 7(a), and because the issue is fairly presented, I respectfully dissent.