### PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, WASHINGTON, Petitioner,

v.

### FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

PJM Interconnection, L.L.C.,
et al., Intervenors.

Nos. 00–1174 through 00–1182, 00–1184.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 17, 2001.

Decided Dec. 11, 2001.

Eric L. Christensen argued the cause for petitioner Public Utility District No. 1 of Snohomish County, Washington. With him on the briefs were Michael J. Gianunzio and Deborah A. Swanstrom.

David B. Raskin and Elias G. Farrah argued the cause for Jurisdictional Utilities and Supporting Intervenors. With them on the briefs were Mary A. Murphy, David P. Sharo, Charles G. Cole, Alice E. Loughran, Richard T. Saas, Donald A. Kaplan, Andrew N. Greene, David Earl Goroff, Elizabeth Ward Whittle, Stuart A. Caplan, Michael E. Small and Paul M. Flynn. Catherine M. Giovannoni, Steven J. Ross, Edward H. Comer, Kelly D. Hewitt, Joseph H. Fagan and Scott Wilensky entered appearances.

Jonathan D. Schneider argued the cause and filed the briefs for petitioner South Carolina Public Service Authority.

Susan N. Kelly and Milton J. Grossman were on the brief for intervenor Transmission Dependent Utility Systems.

Dennis Lane, Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief was Larry D. Gasteiger, Attorney. Beth G. Pacella and David H. Coffman, Attorneys, entered appearances.

Robert C. McDiarmid, Daniel I. Davidson, Cynthia S. Bogorad, Susan N. Kelly, Milton J. Grossman and Barry Cohen were on the brief for intervenors American Public Power Association, et al. Joseph P.

Serio, Wallace F. Tillman, Alan J. Roth and David E. Pomper entered appearances.

David B. Raskin and Charles G. Cole were on the brief for intervenor Edison Electric Institute on the passive ownership issue.

Before: RANDOLPH, ROGERS, and GARLAND, Circuit Judges.

Opinion for the Court filed PER CURIAM.

PER CURIAM:

On December 20, 1999, the Federal Energy Regulatory Commission promulgated a final rule to advance the formation of regional transmission organizations ("RTOs"). *See Regional Transmission Organizations,* Order No.2000, FERC Stats. & Regs. ¶ 31,089 (1999), 65 Fed.Reg. 810 (2000) ("Order 2000"), *on reh'g,* Order No. 2000–A, FERC Stats. & Regs. ¶ 31,-092, 65 Fed.Reg. 12,088 (2000) ("Order 2000–A") (codified at 18 C.F.R. § 35.34).[1] On February 25, 2000, the Commission denied rehearing while clarifying certain provisions of the rule. *See* Order 2000–A, ¶ 31,092, at 31,354. The petitioners raise a variety of challenges to Order 2000, principally on the grounds that the Commission exceeded its statutory authority, and if it did not, that it acted arbitrarily and capriciously and contrary to law.

The contentions of the Jurisdictional Utilities ("Utilities") are premised on the view that Order 2000 not only mandates certain informational filings as to expected RTO participation but also has the effect of mandating RTO participation. We hold first, that the challenged requirements of Order 2000 are voluntary and impose no mandatory requirements upon the Utili-

---

**1.** All references to Order 2000 and Order 2000–A refer to pages in the FERC Stats. and Regs. Unless otherwise indicated, references to "Order" or "Order 2000" refer to the final rule and its preambles.

ties, and second, that the Utilities have failed to demonstrate that they are aggrieved by Order 2000. Accordingly, we dismiss the Utilities' petitions for lack of jurisdiction.

We dismiss as well the petition of the Public Utility District No. 1 of Snohomish County, Washington, which challenged the Commission's failure to address the costs and benefits of RTO formation, and the petition of the South Carolina Public Service Authority, which sought review of the Commission's refusal to forbid passive ownership of an RTO by market participants.

I.

Historically, electric utilities were vertically integrated, owning generation, transmission, and distribution facilities and selling these services as a "bundled" package to wholesale and retail customers in a limited geographical service area. *Promoting Wholesale Competition Through Open Access Non-discriminatory Transmission Services by Public Utilities, Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, 60 Fed.Reg. 17,662, 17,668 (proposed Apr. 7, 1995) (codified at 18 C.F.R. §§ 35.15, 35.26–35.29). Beginning in the late 1960s, however, significant economic changes and technological advances in generation and transmission gave rise to many new entrants in the generating markets, which, by using smaller scale technology, could sell energy at a lower price than many utilities' existing generation facilities. *Id.* at 17,671. But barriers to a competitive wholesale

power market remained because if and when the existing vertically integrated utilities provided regional transmission access to these new efficient generating plants, they favored their own generation. *Id.*

Concluding that these practices were unduly discriminatory and anti-competitive, the Commission issued Orders 888 and 889 in 1996.[2] Orders 888 and 889 established the foundation for the development of competitive wholesale power markets by requiring non-discriminatory open access transmission services by public utilities. *See Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 682 (D.C.Cir.2000) (*"TAPSG"*). In the Notice of Proposed Rulemaking underlying the Order now on review, the Commission observed that Orders 888 and 889 "required a significant change in the way many public utilities have done business for most of this century," and that "most public utilities accepted these changes and made substantial good faith efforts to comply with the new requirements." *See* Notice of Proposed Rulemaking, *Regional Transmission Organizations*, 64 Fed.Reg. 31,-390, 31,393 (1999) (*"NOPR"*).

Since the issuance of Orders 888 and 889 the electric industry has changed significantly in response to those orders. The availability of open access transmission tariffs has resulted in a much greater reliance on wholesale markets to provide generation resources, which in turn, has resulted in the increase of interregional electricity transfers. This has caused various changes in the industry, including the

---

**2.** Promoting Wholesale Competition Through Open Access Nondiscriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, Order No. 888, 61 Fed.Reg. 21,540 (1996), *clarified*, 76 F.E.R.C. ¶ 61,009, 1996 WL 363765 and 76 F.E.R.C. ¶ 61,347 (1996), *on reh'g*, Order No. 888–A, 62 Fed. Reg. 12,274, *clarified*, 79 F.E.R.C. ¶ 61,182, 1997 WL 257595 (1997), *on reh'g*, Order No. 888–B, 62 Fed.Reg. 64,688 (1997), *on reh'g*, Order No. 888–C, 82 F.E.R.C. ¶ 61,046, 1998 WL 18148 (1998); *Open Access Same–Time Information System and Standards of Conduct*, Order No. 889, 61 Fed.Reg. 21,737 (1996), *on reh'g*, Order No. 889–A, 62 Fed.Reg. 12,484 (1997), *on reh'g*, Order No. 889–B, 81 F.E.R.C. ¶ 61,253, 1997 WL 732418 (1997).

divestiture by integrated utilities of their generating assets, an increase in mergers, increases in new participants in the industry in the form of independent power marketers and generators, an increase in the total volume of trade in the wholesale electricity market, state efforts to increase retail competition, and new and different uses of the transmission grid. In sum, the Commission observed in the underlying NOPR that "[t]he very success of Order Nos. 888 and 889, and the initiative of some utilities that have pursued voluntary restructuring beyond the minimum open access requirements, have put new stresses on regional transmission systems— stresses that call for regional solutions." *Id.*

In response to these changes in the structure and functioning of the electric industry, the Commission investigated the need for regional transmission entities. The Commission staff found that the transmission grid was being used more intensively than in the past and that "market institutions were not adequately prepared to deal with such a dramatic series of events," as had occurred, for example, mid-June 1998 when the Midwest experienced unprecedented high spot market prices. *Id.* at 31,394. The staff concluded that to address reliability concerns and foster competition, "better regional coordination in areas such as maintenance of transmission and generation systems and transmission planning and operation" was required. *Id.* Although, in the wake of Orders 888 and 889, some members of the industry attempted to form various regional entities, the results were "haphazard" and "inconsistent"; while some succeeded, others failed, and "much of the country's transmission facilities remain[ed] outside

of an operational regional transmission institution." *Id.* at 31,395.

In Order 2000, the Commission identified two categories of remaining barriers to a competitive wholesale electric market envisioned in Orders 888 and 889: (1) engineering and economic inefficiencies in the current transmission grid; and (2) lingering opportunities for transmission owners to discriminate to favor their own activities. The Commission issued Order 2000 to advance the formation of RTOs in response to these two concerns, indicating that RTOs will remedy "economic and engineering inefficiencies and the continuing opportunity for undue discrimination." Order 2000, ¶ 31,089 at 31,017. According to the Commission, RTOs could: "(1) improve efficiencies in transmission grid management; (2) impose grid reliability; (3) remove remaining opportunities for discriminatory transmission practices; (4) improve market performance; and (5) facilitate lighter handed regulation." *Id.* at 30,933.

The final rule, as contained in Order 2000 and clarified by Order 2000–A, specifies both the minimum characteristics and functions that a regional entity must satisfy in order to be considered an RTO under the rule. *See* 18 C.F.R. §§ 35.34(j), (k); *see also id.* § 35.34(*l*). The final rule, however, adopts a flexible approach to the structuring of RTOs, allowing an RTO to take the form of an ISO, transco, a combination of the two, or some other form as long as it meets the minimum function and characteristic requirements set forth in the rule.[3] *See id.* § 35.34(b)(1). Five of the minimum requirements of an RTO are relevant to this appeal. First, among the minimum characteristics of an RTO,

---

**3.** "Transcos," short for transmission companies, both own and operate transmission facilities for profit. "Independent system operators" (ISOs), in contrast, are non-profit organizations that operate the transmission facilities that others own. Thus, unlike ISOs, transcos do not separate the ownership from the operation of the facilities.

the rule specifies that RTOs must have independence from market participants. *See id.* § 35.34(j)(1). As one means of ensuring such independence, although the rule allows transmission owners to "retain the authority under section 205 of the Federal Power Act [ ("FPA" or "Act")] (16 U.S.C. [§] 824d) to seek recovery from the [RTO] of the revenue requirements associated with the transmission facilities that they own," the rule requires that RTOs have "exclusive and independent authority under [§ 205 of the Act] to propose rates, terms and conditions of transmission service provided over the facilities it operates." *Id.* § 35.34(j)(1)(iii) & note. Second, as another means of ensuring independence, the final rule provides that the "[RTO], its employees, and any non-stakeholder directors must not have financial interests in any market participant." *Id.* § 35.34(j)(1)(i). The rule does not, however, prohibit passive ownership, but rather allows the Commission to review passive ownership proposals on a case-by-case basis. Third, among the minimum characteristics of an RTO, the rule prescribes the regional scope of RTOs, *see id.* § 35.34(j)(2), but leaves specific regional cost-benefit analyses to be conducted on a case-by-case basis. Fourth, among the minimum functions of an RTO, the rule specifies that the RTO must have planning and expansion authority, *see id.* § 35.34(k)(7). Fifth, the rule creates an "open architecture" policy, which requires all RTO proposals to allow the RTO the flexibility to improve its structure and operations to meet· demands. *See id.* § 35.34(*l*).

In order to encourage RTO participation and formation, the final rule requires every public utility, as defined by § 201 of the FPA, 16 U.S.C. § 824(e), that owns, operates or controls facilities for the transmission of electric energy in interstate commerce to make certain filings with respect to their participation in an RTO, *see*

18 C.F.R. § 35.34(a), and establishes a collaborative process to facilitate the voluntary development of RTOs. *See* Order 2000, ¶ 31,089 at 30,991, 30,994. All public utilities not currently in an ISO must file with the Commission either a proposal to participate in an RTO or an "alternative filing" by October 15, 2000. 18 C.F.R. § 35.34(c). A public utility that is currently a member of an ISO must file with the Commission by January 15, 2001, a statement that it is participating in an approved ISO and an explanation of the extent to which the ISO has the characteristics and functions of an RTO; to the extent the ISO does not conform to the requirements of an RTO, the ISO member must provide a proposal to participate in an RTO, a proposal to modify the ISO to conform to the requirements of an RTO, or an "alternative filing." *Id.* § 35.34(h). For all·public utilities, the "alternative filing" must describe any efforts made to participate in an RTO, a detailed explanation of why the utility has not made a filing to participate in an RTO, and the "specific plans, *if any,* the public utility has for further work toward participation" in an RTO. *Id.* § 35.34(g) (emphasis added).

## II.

The Jurisdictional Utilities do not challenge the Commission's overarching objective to encourage participation in and formation of RTOs. Indeed, they hardly could, for in the Federal Power Act Congress has directed the Commission both "to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy" and "to promote and encourage such interconnection and coordination within each such district and between such districts." FPA § 202(a), 16 U.S.C. § 824a(a). Instead, the Utilities challenge certain aspects of the minimum requirements and

functions of RTOs set forth in Order 2000. Specifically, they contend that: (1) the Commission lacked the statutory authority to mandate a division of rate filing responsibilities in which transmission owners must involuntarily cede their alleged statutory right to file rates; (2) the Order's division of rate filing responsibilities is arbitrary and capricious both because the division was unjustified and because it would hinder the transmission owners' ability to recover their costs; (3) Order 2000 improperly limited transmission owners' right to contract to make unilateral rate modifications; (4) the Order's open architecture requirement is arbitrary and capricious; and (5) the Order's transmission expansion requirement impermissibly abdicated the Commission's authority to approve interconnections and expansions. The Commission responds that none of these contentions are properly before the court because (1) the Utilities are not aggrieved by Order 2000 as is required to seek review under § 313(b) of the Act, 16 U.S.C. § 825*l*(b), and (2) the issues presented on appeal are not ripe. Because we conclude that the Utilities lack standing because they have suffered no injury in fact, we need not reach whether the Utilities' claims are also unripe. *City of Orrville v. FERC*, 147 F.3d 979, 987 n. 10 (D.C.Cir.1998).

 Section 313(b) of the Act, pursuant to which the Utilities seek judicial review of Order 2000, provides that a party must be aggrieved by the Commission's order. *See* 16 U.S.C. § 825*l*(b). A party is aggrieved within the meaning of § 313(b) if it can establish both the constitutional and prudential requirements for standing. *See La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C.Cir. 1998). In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Supreme Court set forth the familiar three requirements for constitutional standing: (1) "the plaintiff must

have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560, 112 S.Ct. at 2136 (citations omitted) (internal quotation marks omitted).

The validity of the Commission's jurisdictional argument turns on whether Order 2000 requires the Utilities to participate in an RTO, or rather merely encourages them to join or form an RTO voluntarily. If Order 2000 mandates RTO participation, the Utilities will suffer the immediate and concrete injury of involuntarily having to cede their claimed statutory rights and being subject to allegedly arbitrary and capricious agency action. Thus, mandated participation in an RTO gives the Utilities the unpleasant choice between Scylla and Charybdis—either participate in an RTO and lose their claimed statutory rights pursuant to the allegedly unlawful authority of the Commission or face sanctions. By contrast, if Order 2000 is voluntary as to RTO participation, the Utilities need not participate in an RTO at all, and even if they choose to participate in an RTO, they will not be involuntarily ceding any claimed statutory rights, but rather voluntarily waiving them. Accordingly, we first examine whether Order 2000 is voluntary.

### A.

The Jurisdictional Utilities base their challenges to Order 2000 on the premise that it is not voluntary. In their main brief, they set forth three bases for their contention that the Commission "cannot

evade all responsibility for its actions by declaring its entire program 'voluntary.'" First, they maintain that those transmission owners that joined ISOs before the issuance of Order 2000 have no practical choice but to participate in an RTO because they cannot alter their existing ISO structure without the Commission finding that withdrawal is in the public interest and, in Order 2000, according to the Utilities, the Commission found that the public interest requires participation in RTOs. For other transmission owners, they contend, "it is hard to see either Order No. 2000 or its deprivation of section 205 rights as voluntary" because the Commission "has required every public utility either to file an RTO proposal or justify why it has not done so." Finally, they maintain the Commission's "concept of 'voluntariness' is but a mirage," inasmuch as the Commission in Order 2000 noted its authority to require membership in an RTO as a condition for approving mergers and other corporate restructurings, and to make grants of authority to charge market-based rates contingent on RTO membership. The Utilities rely on colorful language in *Associated Gas Distributors v. FERC*, 824 F.2d 981 (D.C.Cir.1987), in which the court declined to treat as voluntary the provision of Order No. 436 that required those gas pipelines that opted to secure a "blanket certificate" for the provision of gas transportation to make an "open-access" commitment. The court reasoned that refusal to provide blanket-certificate transportation could spell bankruptcy and opting not to could be fatal. *Id.* at 1024. The court observed that "when a condemned man is given the choice between the noose and the firing squad, we do not ordinarily say that he has 'voluntarily' chosen to be hanged." *Id.*

■ There are two main difficulties with the Utilities' premise that Order 2000 mandates RTO formation and participation. First, the text and preambles of the final rule do not support their contention. Second, notwithstanding the text, the Utilities fail to offer anything to support their contention that for practical purposes RTO participation is not voluntary.

Order 2000, by its own terms, does not mandate RTO participation. *See* 18 C.F.R. §§ 35.34(c), (g), (h). It requires all public utilities (whether they are members of an ISO or not) to file either a proposal to participate in an RTO or an alternative filing. *See id.* §§ 35.34(c), (h). The alternative filing need only describe efforts made to participate in an RTO, an explanation of obstacles to participating in an RTO, and the specific plans, *if any*, that the public utility has to participate in an RTO in the future. *See id.* § 35.34(g). The voluntariness of Order 2000 thus lies in the existence of the alternative filing, which enables any public utility to opt not to participate in an RTO. Therefore, although the filing requirements are mandatory, participation in an RTO is not.

The preambles confirm that Order 2000 neither was intended to mandate nor does mandate RTO participation. In the preamble to Order 2000, the Commission repeatedly stated that it was implementing a "voluntary approach to RTO formation" and that only the filing requirement is mandatory. *See* Order 2000, ¶ 31,089 at 31,034. Indeed, the Commission expressly noted the view that its RTO proposal cannot really be said to be voluntary because nonparticipation in an RTO will result in negative consequences for nonparticipants, and replied that it was "not adopting as a generic policy in this Final Rule ... that RTO participation is required." *Id.* Notwithstanding skepticism by many commentators that a voluntary approach would accomplish the Commission's goals, the Commission stuck to its guns and concluded that although "it is clear that RTOs are needed to resolve impediments to fully

competitive markets," "we continue to believe, as we proposed in the NOPR, that at this time we should pursue a voluntary approach to participation in RTOs." *Id.* at 31,033. The Commission explained:

> [A] voluntary approach as we have structured it, with guidance and encouragement from the Commission, is most appropriate at this time. Given the rapidly evolving state of the electric industry, we want to allow involved participants the flexibility to develop mutually agreeable regional arrangements with respect to RTO formation and coordination.

*Id.* In what proved to be a dashed hope, the Commission continued, "[f]urther, we want the industry to focus its efforts on the potential benefits of RTO formation and how best to achieve them, rather than on a non-productive challenge to our legal authority to mandate RTO participation." *Id.*

The preamble to Order 2000–A underscores the Commission's already explicit meaning of Order 2000, stating that "the Commission adopted as a matter of policy a voluntary approach to RTO formation" and that "Order No. 2000 does not mandate RTO participation." Order 2000–A, ¶ 31,092 at 31,357. Both preambles also distinguished the Commission's authority to voluntarily encourage RTO participation, pursuant to § 202(a) of the Act, from the Commission's authority to mandate RTO participation on a case-by-case basis to remedy undue discrimination or anti-competitive effects pursuant to §§ 206 and 309 of the Act. *See* Order 2000, ¶ 31,089 at 31,043; Order 2000–A, ¶ 31,092 at 31,360.

Nevertheless, the Utilities would have this court read "between the lines" of Order 2000, contending that the Order is involuntary in effect because of the remedial actions that the Commission might take against those utilities that fail to participate in an RTO. According to the Utilities, Order 2000 has the practical effect of mandating RTO participation both because current members of an ISO have no choice but to participate in an RTO because they cannot exit their existing ISO structure as the Commission found that the public interest requires participation in an RTO, and because the Commission has the authority to condition the approval of mergers and market-based rates on RTO participation. The Utilities' characterization of Order 2000 directly contradicts its text and effects and, hence, does not change the Order's voluntary nature.

As an initial matter, the text of Order 2000 does not support the Utilities' contentions. The Commission made neither a generic finding that RTO participation is required for a disposition of jurisdictional facilities to be in the public interest, nor a generic finding that would enable it to condition the approval of all future mergers and market-based rates on participation in an RTO. To the contrary, the preamble to Order 2000 explicitly stated otherwise:

> We are not adopting as a generic policy in this Final Rule either that RTO participation is required in order to retain or obtain market-based rate authorization for wholesale power sales, or that RTO participation is required for a disposition of jurisdictional facilities to be in the public interest.

Order 2000, ¶ 31,089 at 31,034; *accord id.* at 31,044–45. The preamble to Order 2000–A confirms this:

> In response to those who argue that the Commission should state generically that all market-based rates and mergers must be conditioned on RTO participation, we continue to believe that this is best addressed on a case-by-case basis. We see no need to decide at this time that no merger or market-based

rate proposal could satisfy our applicable standards without RTO participation. There will be sufficient opportunity to consider this in the context of individual cases.

Order 2000–A, ¶ 31,092 at 31,358. Because neither of the preambles made these generic findings, the Utilities should be no more fearful of these future individual actions after the issuance of the final rule than they were before its issuance.

Although the Commission implicitly stated in Order 2000 that it might be more inclined to allow affiliated sellers to charge market-based rates if the transmission affiliate belonged to an RTO and that it would also more readily approve mergers and acquisitions in that circumstance, this does not change the current state of the law: the Commission approves market-based rates only if the seller and its affiliates either do not have or have adequately mitigated market power. *See La. Energy & Power Auth.,* 141 F.3d at 365; *Cajun Elec. Power Coop. v. FERC,* 28 F.3d 173, 176 (D.C.Cir.1994). The fact that an RTO member may more readily satisfy the applicable standards for market-based rates or merger approvals has no bearing on whether other entities satisfy the standards as well.

It is conceivable that Order 2000's provisions on RTOs are, in effect, mandatory if Order 2000 will result in participation in RTOs because of the benefits of joining or forming an RTO (and, in the same vein, the resulting costs of not doing so), *see Associated Gas Distribs.,* 824 F.2d at 1024, but the Utilities have come forward with no evidence to support this conclusion. Absent such a showing, the court has no reason not to take the Commission at its word that Order 2000 is voluntary. *Cf. N. Ind. Pub. Serv. Co. v. FERC,* 954 F.2d 736, 740 (D.C.Cir.1992) ("*NIPSCO*").

Furthermore, the Utilities' conception of Order 2000 as mandating RTO partic-

ipation makes no mention of the alternative filing option that allows any public utility—whether it is a member of an ISO or not—to decline to participate in an RTO without penalty (beyond those that are available to the Commission under the Federal Power Act regardless of the final rule). *See* 18 C.F.R. §§ 35.34(c)(2), (h)(3)(iii). The Utilities respond that they do not want to file an alternative filing because they want to participate in an RTO, and hence they urge the court to construe Order 2000 to mandate RTO participation because it sets forth mandatory requirements for the minimum characteristics and functions of an RTO. In this regard, the Utilities point to several recent orders of the Commission in which it declined to recognize an entity in its entirety as an RTO because it did not meet the minimum requirements specified in Order 2000. *See N.Y. Indep. Sys. Operator,* 96 F.E.R.C. ¶ 61,059 at 61,187 (July 12, 2001); *PJM Interconnection, L.L.C.,* 96 F.E.R.C. ¶ 61,061 at 61,243–44 (July 12, 2001). In essence, however, the Utilities do not want to participate in an "RTO" as the Commission has envisioned it in Order 2000. Rather, they want to form some different entity, presumably to gain some of the advantages that the Commission has identified in Order 2000, but neither formation of nor participation in this entity appears to be precluded by Order 2000 itself, as the alternative filing provision, 18 C.F.R. § 35.34(g), makes clear.

For these reasons, we conclude that the language of Order 2000 is sufficient to establish that RTO participation is voluntary.

### B.

Returning to consideration of the Commission's position that the court lacks jurisdiction to review the Utilities' challenges to Order 2000, we conclude that the Utili-

ties have failed to show that they have suffered an injury in fact as a result of the final rule.

The Utilities set forth a variety of ways in which Order 2000 injures them, including that, upon joining or forming an RTO, (1) they are deprived of their claimed statutory right to file with the Commission rate changes for services to customers, (2) they risk losing their investments in transmission assets because of the Order's division of rate filing responsibilities, (3) they lose the alleged right to contract directly with current and potential customers, (4) they lose management control as to the operation of their assets, and (5) the rates they are paid for transmission services will decline. All of these injuries only come to pass, however, if a public utility opts to participate in an RTO; Order 2000 does not mandate this. Rather, Order 2000 only mandates a filing requirement, which allows any public utility to make an alternative filing. None of the Utilities' claimed injuries will occur if they opt to make an alternative filing and do not participate in an RTO. To the extent the Utilities may want to participate in an "RTO-like" organization with different rate filing divisions, nothing in Order 2000 prevents them from doing so; public utilities can avoid being locked into an RTO by submitting an alternative filing. Because none of the Utilities' injuries will come to fruition if they opt to make an alternative filing, their stated injuries are non-existent or at least highly speculative; thus, they are inadequate to give rise to an injury in fact. *See N.C. Utils. Comm'n v. FERC,* 653 F.2d 655, 664 (D.C.Cir.1981).

Noticeably absent from the Utilities' alleged injuries is a harm that stems from the mandatory requirement of Order 2000—the filing requirement itself. They neither challenge the filing requirement nor contend that they are harmed by it. Thus, they have set forth no injury in fact

that they suffer from Order 2000, and hence they are not aggrieved as required under § 313(b) of the Act.

Accordingly, in view of our conclusion that Order 2000 does not mandate RTO participation, the court lacks jurisdiction to address the Utilities' challenges to the final rule.

### III.

■ Petitioner Public Utility District No. 1 of Snohomish County, Washington ("Snohomish") seeks review of the Commission's assessment that RTOs will be cost-effective. Snohomish also contends that the Commission's failure to require those filing RTO proposals to demonstrate the cost-effectiveness of the proposed RTO is both irrational and contrary to law. Because Snohomish has not suffered an injury as a result of Order 2000, and because the Commission agrees that it must consider cost-benefits when evaluating RTO proposals, we dismiss the petition for review.

Snohomish argues that, in requiring all public utilities to file RTO proposals, the Commission failed to appreciate the unique circumstances in the Pacific Northwest, where 75 percent of the transmission power lines are owned and operated by the Bonneville Power Administration. Because of Bonneville's dominant position, the negative effects from the "balkanization" of service providers, effects that prompted the Commission to promulgate Order 2000, are allegedly not present in Snohomish's region. If there is no balkanization, Snohomish's argument continues, then there is no reason to impose the costs of RTO formation on consumers in the Pacific Northwest. Snohomish contends that forming an RTO in the Pacific Northwest is not in the public interest because the costs of formation will outweigh any benefits in service and efficiency. Snoho-

mish bases this argument largely on its prediction of negative economic consequences for Bonneville (and its bondholders) if Bonneville is forced to relinquish control of transmission assets to an RTO. Snohomish also postulates that the Commission has overemphasized the benefits a Pacific Northwest RTO will provide. The Commission disagreed with Snohomish's assessment and denied its request for rehearing of Order 2000.

The Commission questions our jurisdiction to hear Snohomish's petition on the ground that Snohomish is not "aggrieved" within the meaning of § 313(b). 16 U.S.C. § 825*l*(b). As the Commission sees it, Order 2000 does not require Snohomish, which is not a "public utility" subject to the Order, to do anything. The Commission also views Snohomish's claims as unripe. If we reach the merits, the Commission urges us to rule in its favor on the ground that substantial evidence of the nationwide savings of RTO formation supports its Order.

Snohomish's complaints are both specific and general. With respect to the specific issue of RTO formation in the Pacific Northwest, Snohomish offered data to prove that this would be more costly than any resulting benefit. Snohomish complains that the Commission did not adequately consider this data. Snohomish also presented a general argument—*any* RTO applicant must demonstrate cost-effectiveness before the Commission approves the application; Order 2000 does not provide this safeguard; therefore, the Order violates the Federal Power Act because it does not ensure that the Commission will approve only RTOs that are in the public interest, as §§ 203 and 205 of the FPA require. *Id.* §§ 824b, 824d.

Order 2000 is but a preliminary step. It encourages *voluntary* RTO formation. *See* Part II, *supra*. If Snohomish's general argument stood alone we would dismiss its petition for lack of "aggrievement." Order 2000 does not provide for Commission approval of any RTOs; it requires only that public utilities file proposals or explain why they are not doing so. Snohomish does not argue that it would suffer any actual injury if the Commission approved an inefficient RTO in, for example, New Jersey. Snohomish is connected to an entirely separate regional power grid. *See City of Orrville,* 147 F.3d at 979.

Snohomish's more specific complaint is a different matter. There are currently pending before the Commission proceedings on an application for an RTO in the Pacific Northwest. In *Avista Corp.,* 95 F.E.R.C. ¶ 61,114 (Apr. 26, 2001), *reh'g granted in part and clarified in part,* 96 F.E.R.C. ¶ 61,058, 2001 WL 789463 (July 12, 2001), decided after Order 2000 issued, RTO filers in the Pacific Northwest (including Bonneville) sought a declaratory order from the Commission providing *"preliminary* guidance with respect to Governance, Scope and Configuration, and Liability of" the proposed RTO ("RTO West").[4] *Id.* at 61,324 (emphasis added). Snohomish intervened in the proceeding, reiterating the general challenge it sought to raise in the rulemaking—namely, that no RTO proposal may be approved unless the applicants have demonstrated that its benefits will outweigh its costs. The Commission responded as follows:

> In Order No. 2000, the Commission found that the benefits of RTO formation overall outweigh the costs, but it did not require individual cost benefit analy-

---

4. The plan is to merge two RTO filings, RTO West and Transconnect, into one joint pro-

posed RTO, retaining the name RTO West. *See Avista,* 95 F.E.R.C. ¶ 61,114 at 61,322.

ses in compliance filings. We will not reverse that determination here.

*Id.* (footnote omitted).

Snohomish takes this to mean that it is barred from submitting its cost-benefit analysis in the proceeding. That is a misreading of the passage. The Commission was simply reiterating its rejection of Snohomish's general argument. It was not, as Snohomish thinks, stating that it would refuse to consider cost-benefit analyses in determining whether to approve an RTO for the Pacific Northwest. Far from it. As Commission counsel explained at oral argument, the Commission must—in order to comply with the Federal Power Act and the Administrative Procedure Act, *see* 16 U.S.C. §§ 824b, 824d; 5 U.S.C. § 706; *see also Office of Consumers' Counsel v. FERC,* 783 F.2d 206, 227 (D.C.Cir.1986)—adequately address Snohomish's specific cost-benefit evidence (if Snohomish presents it) prior to the Commission's final decision on the RTO proposal for the Pacific Northwest. RTO West is itself undertaking its own cost-benefit analysis of the proposal. *See Avista,* 95 F.E.R.C. ¶ 61,114 at 61,324 n. 6.

The short of the matter is that in the site-specific proceeding, Snohomish may accomplish all it set out to accomplish in the rulemaking. Snohomish cannot point to any particular hardship it will suffer from having to wait to make its case in that forum. *See Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967); *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 164–65, 87 S.Ct. 1520, 1524–25, 18 L.Ed.2d 697 (1967). And there is no reason why the Commission should have passed judgment on Snoho-

mish's evidence in its general rulemaking proceeding.[5] *See NIPSCO,* 954 F.2d 736 at 738.

### IV.

█ The objection of petitioner South Carolina Public Service Authority ("Authority") is that Order 2000 allows for up to 100 percent passive ownership of an RTO by market participants, in contravention of the Order's avowed "independence principle." This supposedly makes the Commission's reasoning arbitrary and capricious, and its decision to permit passive ownership unsupported by substantial evidence. The Commission contends that we should not entertain the Authority's challenge at this stage of RTO development.

The Authority wholeheartedly supports RTO formation and applauds the Commission for tackling the difficult task of reforming the electricity transmission field. But the Authority believes that the Commission has set its Order up for failure by not prohibiting outright the passive ownership of RTOs by market participants. According to the Authority, if market participants are allowed to own as much as 100 percent of an RTO, then discriminatory rates and inefficient resource allocation will continue because the RTO will not be "independent" from the market participants even if they are merely passive owners.

The Commission justifies permitting passive ownership on the basis of comments received from market participants indicating that adverse tax consequences may prevent public utilities from forming a type of RTO known as a "transco." In a

---

5. Whether all of this amounts to mootness, or ripeness, or lack of aggrievement on Snohomish's part is not of great concern for "the critical issue is apt to be less a matter of standing or of actual controversy than of the advisability of reviewing an administrative

rule prior to its application in a specific factual situation." *Toilet Goods Ass'n v. Gardner,* 360 F.2d 677, 684 (2d Cir.1966) (Friendly, J.), *aff'd,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967).

transco, the RTO owns and operates electricity transmission services for a profit. Because RTOs must be independent from market participant control, their voluntary formation may be impeded by the adverse tax (and other economic) consequences facing a public utility wanting to sell transmission facilities to an RTO. The Commission asserts that permitting passive ownership—provided that procedural and substantive safeguards exist to ensure that public utilities do not effectively control an RTO's § 205 rate filings or grid distribution functions—facilitates the formation of RTOs. The Authority does not think that the Commission's reliance on safeguards such as audits every three years, *see* 18 C.F.R. §§ 35.34(j)(1)(iv)(A) & (B), rationally reflects its commitment to encourage the formation of RTOs which are independent of public utility control.

The Authority would be "aggrieved" within the meaning of § 313(b), *see La. Energy & Power Auth.*, 141 F.3d at 366, only if its assumption about passive ownership—that market participants will dominate RTOs despite having no formal control authority—is a correct prediction. Yet the Order calls only for RTO proposals. The Authority could suffer injury only if passive ownership occurs in an RTO operating in its region. It is difficult to see how the Authority is now "aggrieved" by Order 2000. *See City of Orrville*, 147 F.3d at 985. We would therefore be inclined to dismiss its petition on ripeness grounds. This would still allow the relationship between passive ownership and RTO independence to be evaluated with respect to a specific RTO proposal encompassing the Authority's region. *See NIPSCO*, 954 F.2d at 737–38.

The Authority points out that an RTO proposal—the Grid-South proposal—covering its region was filed, that the Authority challenged it on the passive ownership ground, and that the Commission ruled that this was "an impermissible collateral attack on … Order No.2000." *Carolina Power & Light Co.*, 95 F.E.R.C. ¶ 61,282 at 61,988, 2001 WL 576868 (May 30, 2001). The Authority treats the Commission's ruling as deciding that it cannot oppose passive ownership even when it may be affected directly by an RTO in that form. That is a misreading of the Commission's decision. The Commission did not foreclose the Authority from raising the specific claim that GridSouth (or any RTO in the Authority's region) could injure consumers in South Carolina because of impermissible passive owner dominance. The Commission simply rejected the Authority's "generic" argument that permitting passive ownership is per se unacceptable. In doing so, the Commission made clear that the Authority had not challenged the "detailed findings" the Commission made concerning the effectiveness of safeguards to ensure that passive ownership of Grid-South is truly passive. *Id.* at 61,988–89.

In any event, what the Authority actually contests is the Commission's failure to promulgate a rule prohibiting passive ownership of RTOs. If the Authority had its way, there would be a paragraph in Order 2000 stating that "100 percent passive ownership of an RTO by market participants is prohibited." Instead of addressing passive ownership by rulemaking, the Commission decided to adjudicate the issue in the context of specific RTO proposals (for example, GridSouth). This selection of adjudication over rulemaking is well within the Commission's discretion. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294, 94 S.Ct. 1757, 1771–72, 40 L.Ed.2d 134 (1974); *see also SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1581 (1947); *City of Orrville*, 147 F.3d at 988 n. 11. Because the possibility of passive ownership, by itself, causes the Authority no injury, and because case-by-case adjudications present a better forum in which to challenge the effectiveness of passive own-

ership safeguards, the petition for review is dismissed.

* * * *

For the foregoing reasons, the petitions for review of the Jurisdictional Utilities, Public Utility District No. 1 of Snohomish County, Washington, and the South Carolina Public Service Authority are dismissed.