Notice: This opinion is subject to formal revision before publication in the
Federal Reporter or U.S. App. D.C. Reports. Users are requested to notify the
Clerk of any formal errors in order that corrections may be made before the
bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 6, 2004          Decided January 14, 2005

No. 04-1020

DTE ENERGY COMPANY AND
DETROIT EDISON COMPANY,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

DEARBORN INDUSTRIAL GENERATION, LLC AND
INTERNATIONAL TRANSMISSION COMPANY,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Michael C. Griffen* argued the cause for petitioners. With
him on the briefs was *John D. McGrane*.

*Beth G. Pacella*, Attorney, Federal Energy Regulatory

Commission, argued the cause for respondent. On the brief were *Cynthia A. Marlette*, General Counsel, *Dennis Lane*, Solicitor, and *Lona T. Perry*, Attorney.

Before: GINSBURG, *Chief Judge*, and ROGERS and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The DTE Energy Company and the Detroit Edison Company ("Detroit Edison") petition for review of three orders of the Federal Energy Regulatory Commission ruling that certain distribution and interconnection facilities are transmission facilities subject to the Commission's exclusive jurisdiction. DTE's petition is not properly before the court because it failed to seek rehearing or petition for review of its aggrieving order. *See* 16 U.S.C. § 825*l*(b). Detroit Edison's petition for review of two orders is properly before the court, and it contends the Commission acted arbitrarily and capriciously because the facilities at issue are "dual-use" local distribution/transmission facilities and should therefore be subject to the shared jurisdiction of the Commission and the State of Michigan. Ordinarily, this would occasion our review of the Commission's application of its seven-factor jurisdictional test adopted in Order No. 888,[1] which the

---

[1] *See Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, 61 Fed. Reg. 21,540 (May 10, 1996), FERC Stats. & Regs. ¶ 31,036 at 31,783-84 (1996), *order on reh'g,* Order No. 888-A, 62 Fed. Reg. 12,274 (March 14, 1997), FERC Stats. & Regs. ¶ 31,048 at 30,336 (1997), *order on reh'g*, Order No. 888- B, 81 F.E.R.C. ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 F.E.R.C. ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002) ("Order No.

Commission asserts it applied here. However, because Detroit Edison failed to argue in its petition for rehearing that the Commission misapplied the seven-factor test, the court lacks jurisdiction to consider it now. Instead, Detroit Edison raised on rehearing, as it does on appeal, a substantial evidence challenge to the Commission's factual findings and a collateral attack on the Commission's single-jurisdictional approach. Accordingly, we deny the petition because the Commission's findings in support of its jurisdictional conclusion are supported by substantial evidence in the record and its collateral attack is precluded.

## I.
### A.

Section 201 of the Federal Power Act ("FPA"), 16 U.S.C. § 824(b)(1), empowers the Commission to regulate both wholesale sales of electric energy in interstate commerce and interstate electric energy transmissions, by vesting it with "jurisdiction over all facilities for such transmission or sale of electric energy." It also reserves regulatory authority to the states over bundled retail transactions, including the intrastate sale and distribution of electricity through local distribution facilities. *Id.* In *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000) ("*TAPS*"), the court affirmed Order No. 888 in relevant part, deferring to the Commission's interpretation of Section 201 of the FPA to accommodate new industry practices and conditions. *Id.* at 694-95. In Order No. 888, the Commission adopted a seven-factor jurisdictional test to identify unbundled retail-wheeling facilities primarily engaged in local distribution; the Commission claimed exclusive jurisdiction over all other facilities.[2] *Id.* at 691.

_____

888").

[2] The seven factors, which the Commission stated it "will evaluate in determining whether particular facilities are transmission or local distribution in the case of vertically integrated transmission

Thereafter, in *New York v. FERC*, 535 U.S. 1 (2002), the Supreme Court affirmed. By rejecting New York's contention that the dividing line between regulatory authority of the states and the Commission falls between wholesale and retail markets, *id.* at 17, the Court implicitly approved the Commission's single-jurisdictional approach over multi-use unbundled retail-wheeling facilities, *see id.* at 22-23.

Accordingly, the Commission has applied Order No. 888's seven-factor test to determine jurisdictional authority over utilities providing unbundled retail services.[3] *See TAPS*, 225 F.3d at 691. When the Commission recently ignored the seven-factor test to resolve such jurisdictional questions, the court rejected, as contrary to the statute and precedent, the

---

and distribution facilities," are:

> (1) Local distribution facilities are normally in close proximity to retail customers.
> (2) Local distribution facilities are primarily radial in character.
> (3) Power flows into local distribution systems; it rarely, if even, flows out.
> (4) When power enters a local distribution system, it is not reconsigned or transported on to some other market.
> (5) Power entering a local distribution system is consumed in a comparatively restricted geographical area.
> (6) Meters are based at the transmission/local distribution interface to measure flows in the local distribution system.
> (7) Local distribution systems will be of reduced voltage.

Order No. 888 at 31,981.

[3] *E.g., Am. Serv. Co.*, 106 F.E.R.C. ¶ 63,001 (2004); *Puget Sound Energy, Inc.*, 104 F.E.R.C. ¶ 61,272, 61,909 (2003); *Akin, Gump, Strauss, Hauer & Feld, LLP*, 95 F.E.R.C. ¶ 61,375, 62,403 (2001); *Mansfield Mun. Elec. Dep't and N. Attleborough Elec. Dep't*, 94 F.E.R.C. ¶ 63,023 (2001).

Commission's attempt to expand its jurisdiction to set rates for all services occurring over facilities used for both retail and wholesale distribution, expressing concern that "the orders under review totally ignore Order No. 888's carefully formulated seven-factor test for distinguishing between local distribution facilities and 'FERC-jurisdictional facilities.'" *Detroit Edison Co. v. FERC,* 334 F.3d 48, 54 (D.C. Cir. 2003) ("*Detroit Edison*").

**B.**

The instant appeal arises in the context of the Commission's efforts to establish a regional transmission organization ("RTO") to integrate the Midwest wholesale electricity market. In response to rising energy costs in the Midwest, the Commission facilitated the development of a Midwest RTO and the integration of for-profit transmission companies to operate under the RTO umbrella. *See generally Pub. Util. Dist. No. 1 v. FERC,* 272 F.3d 607 (D.C. Cir. 2001). After evaluating competing proposals, the Commission determined that Midwest Independent Transmission System Operator, Inc. ("Midwest ISO") should serve as the foundation for the Midwest RTO.

Detroit Edison and International Transmission ("IT") were both wholly owned subsidiaries of DTE Energy. Detroit Edison operates as DTE Energy's public utility, engaged in the generation, transmission, and distribution of energy in Michigan. *DTE Energy Co.*, 91 F.E.R.C. ¶ 61,317, 62,909 (2000). DTE Energy created IT with the purpose of acquiring ownership of Detroit Edison's transmission assets as a first effort to divest its transmission business to an entity qualified to join the Midwest RTO. *See id.* Thus, on May 4, 2000, DTE, Detroit Edison, and IT sought and received the Commission's authorization to transfer Detroit Edison's transmission facilities with voltage ratings of 120 kV and above to IT. *Id.* Following the January 1, 2001 transfer, IT's transmission facilities, interconnected with those of Michigan Electric Transmission Company, together

comprised substantially all of the Michigan Transmission grid. *Int'l Transmission Co.*, 97 F.E.R.C. ¶ 61,328, 62,534 (2001).

Pursuant to the Commission's approval of Midwest ISO as the regional RTO, IT applied for and received by Order of December 20, 2001, the Commission's authorization to transfer to Midwest ISO functional control over IT's jurisdictional transmission facilities. When IT thereafter submitted an updated list of jurisdictional facilities to be transferred to Midwest ISO, CMS Marketing, Services and Trading Company ("CMS") protested, arguing that the list should include Detroit Edison's facilities interconnecting Dearborn Industrial Generation, LLC ("DIG") with IT—specifically, the 230 kV Navarre-DIG line ("Navarre line"), the 230 kV Baxter-DIG line ("Baxter line"), and the Baxter substation (collectively, "DIG facilities")—because these are the facilities by which DIG sells electric energy to wholesale purchasers, and therefore are Commission jurisdictional transmission facilities. *Int'l Transmission Co.*, 99 F.E.R.C. ¶ 61,211, 61,888 ("May 22, 2002 Order").

By Order of May 22, 2002, the Commission found that the Navarre and Baxter lines appear to perform a jurisdictional transmission function because they are part of the interconnection facility connecting DIG to the transmission grid, and sought additional information from IT to inform the Commission's jurisdictional decision. *Id.* at 61,889. The Commission found the Baxter substation should be included in an updated list of IT's transmission facilities as it had already been included in the FERC Docket No. EC00-86 list of facilities that Detroit Edison was transferring to IT, incorporated into the December 20, 2001 Order. *Id.*

Detroit Edison moved to intervene and responded on July 16, 2002, conceding that the DIG facilities are, in part, interconnection facilities used in wholesale sales from the DIG

Plant, but contending they nevertheless were part of Detroit Edison's local distribution system. Noting that the Baxter and Navarre lines had been developed and historically used to provide retail distribution service to electric loads located in or near the Rouge Industrial Complex in Dearborn pursuant to retail tariffs and contracts, Detroit Edison maintained the facilities were "dual-use" and should be subject to the shared jurisdiction of Michigan and the Commission. Concerned that classifying the facilities as transmission rather than local distribution facilities would cause it to incur stranded costs, Detroit Edison offered alternatively to transfer limited operational control over the DIG facilities to Midwest ISO to the extent necessary to effectuate wholesale sales. CMS again protested, arguing the Navarre line serves as the primary point of interconnection between DIG and IT from DIG's inception, and the Baxter line had been reconfigured to serve as a secondary point of interconnection with IT; it appended an analysis of power flows on the two lines.

Then, on October 4, 2002, Detroit Edison submitted an executed Agency Agreement between it and Midwest ISO that sought to transfer limited functional control over the DIG facilities to enable Midwest ISO to ensure the DIG generator receives non-discriminatory service when using the facilities for wholesale sales. In responding to a deficiency letter from Commission staff, Detroit Edison explained that retail-load customers must obtain retail-delivery service over the Detroit Edison facilities under the state Retail Access Service Tariff ("RAST"), and that ceding complete operational control to Midwest ISO would render Detroit Edison unable to recover its costs under the RAST, including the costs of the Baxter line. DIG and CMS protested, arguing that the DIG facilities are an integral part of the IT system and that points of interconnection from the DIG facilities form a 230 kV loop rather than being radial as is most common for local facilities; hence, the DIG facilities should be subject to the Commission's exclusive

jurisdiction, and the Commission should reject the Agency Agreement.

By Order of March 13, 2003, the Commission found that the DIG facilities perform a transmission, not a state-jurisdictional local distribution function. *Detroit Edison Co.*, 102 F.E.R.C. ¶ 61,282 (2003) ("March 13, 2003 Order"). Specifically, the Commission found that the facilities are high-voltage facilities that together with the DIG ring bus, form a 230 kV loop through which power flows into and out of IT's interstate transmission facilities. *Id.* at 61,906. Noting further that Michigan has implemented retail access for all customers of Michigan's investor-owned utilities, the Commission found that retail customers are entitled to receive unbundled retail access pursuant to a Commission-approved tariff. *Id*. Additionally, the Commission found that DIG, interconnected by the DIG facilities to IT, is selling all its output at wholesale. *Id.* Based on these factual findings, the Commission concluded that the DIG facilities primarily function as transmission facilities, and full operational control should be transferred to Midwest ISO. *Id*. It noted, however, that Detroit Edison should be able to collect its RAST through state-approved charges, and that although "in most cases there will be identifiable local distribution facilities subject to state jurisdiction, we also believe that even when there are no identifiable local distribution facilities, states nevertheless have jurisdiction in all circumstances over the service of delivering energy to end users." *Id.* In its April 11, 2003 Order, *International Transmission Co.*, 103 F.E.R.C. ¶ 61,041 (2003) ("April 11, 2003 Order"), the Commission accepted DTE and IT's compliance filing with modifications to reflect transfer of the DIG facilities to Midwest ISO; it also affirmed its findings in its March 13, 2003 Order.

Finally, by Order of November 17, 2003, the Commission denied, in relevant part, DTE's and Detroit Edison's petitions

for rehearing of the March 13, 2003 and April 11, 2003 Orders, stating that both parties had presented the same arguments as before without offering any new evidence. *Detroit Edison Co.*, 105 F.E.R.C. ¶ 61,209, 62,084 (2003) ("November 17, 2003 Rehearing Order"). In seeking rehearing, Detroit Edison conceded that the DIG facilities are high-voltage facilities that together with DIG's ring bus form a 230 kV loop configuration, and that power can flow into and out of the facilities, but it argued that the DIG facilities also perform a retail distribution function, which should be subject to state jurisdiction. Detroit Edison also moved to reopen the record to include a recent Michigan Public Service Commission order, which it contended supports its view that the facilities perform a retail distribution function. The Commission explained that while local distribution lines may exist, the record demonstrated the DIG facilities were not local distribution facilities. This finding, the Commission observed, "is consistent with the seven-factor test outlined in Order No. 888 for classifying facilities as transmission or local distribution." *Id.* at 62,084-85. The Commission denied Detroit Edison's motion to reopen the record for failure to show an extraordinary change in circumstances outweighing the need for finality and going to the heart of the case. *Id.* at 62,086. The Commission also noted that deference to a state commission's classification was inappropriate here because the Michigan Public Service Commission order did not discuss or apply the seven-factor test or reclassify the DIG facilities. *Id.*

## II.

On appeal, DTE and Detroit Edison challenge the Commission's May 22, 2002 and March 13, 2003 Orders and the November 17, 2003 Rehearing Order. We first address two jurisdictional issues.

## A.

Section 313(a) of the FPA provides that "[a]ny person . . . aggrieved by an order issued by the Commission . . . may apply

for a rehearing . . . ," but "[n]o proceeding to review any orders of the Commission shall be brought by any person unless such a person shall have made application to the Commission for a rehearing thereon." 16 U.S.C. § 825*l*(a). A party may only obtain judicial review of an aggrieving order, in accordance with section 313(b), "within sixty days after the order of the Commission upon the application for rehearing." *Id*. § 825*l*(b). Neither the court nor the Commission has the discretion to ignore this "'express statutory limitation on the jurisdiction of the court.'" *Calif. Dep't of Water Res. v. FERC*, 306 F.3d 1121, 1125 (D.C. Cir. 2002) (quoting *Tenn. Gas Pipeline Co. v. FERC*, 871 F.2d 1099, 1107 (D.C. Cir. 1989)); *Granholm ex rel. Mich. Dep't of Natural Res. v. FERC*, 180 F.3d 278, 280-82 (D.C. Cir. 1999).

DTE Energy petitions for review of the Commission's May 22, 2002 Order, for which it did not seek rehearing before the Commission, but fails to challenge the April 11, 2003 Order, by which it is aggrieved. Hence, DTE Energy is not a proper party to these proceedings. In the May 22 Order, the Commission conditionally accepted the compliance filing by DTE Energy and IT submitted pursuant to the Commission's December 20, 2001 Order, but directed DTE Energy to submit further information in response to CMS's protest regarding the exclusion of the Navarre and Baxter lines as transmission facilities in the filing. It was not until the April 11 Order, in which Detroit Edison intervened, that the Commission accepted DTE Energy's compliance filing with modifications directing DTE Energy, IT, and Detroit Edison to revise their filings to include the DIG facilities as jurisdictional transmission facilities to be transferred to Midwest ISO for operational control. *April 11, 2003 Order*, 103 F.E.R.C. at 61,666-67.

DTE's failure to seek rehearing of the May 22, 2002 Order is fatal to its challenge of that Order in its petition for review. 16 U.S.C. § 825*l*(a); *Cal. Dep't of Water Res.*, 306 F.3d at 1125.

The mandatory requirement of filing a petition for rehearing is designed to afford the Commission an opportunity to invoke its expertise or to correct any errors prior to judicial review, and the court cannot consider DTE's challenge to the May 22 Order anew. *See Granholm*, 180 F.3d at 281. It is unsurprising, however, that DTE Energy did not petition for rehearing of the May 22 Order because it is the April 11 Order, instead, by which it is aggrieved. As the court has explained, "[a] party is aggrieved within the meaning of § 313(b) if it can establish both the constitutional and prudential requirements for standing." *Pub. Util. Dist. No. 1*, 272 F.3d at 613 (citations omitted). DTE Energy can show no injury-in-fact, *see id*. (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)), as a result of the May 22 Order, because it was conditional, subject to a further compliance filing, and thus was without binding effect on DTE Energy. *Cf. Cal. Dep't of Water Res.*, 306 F.3d at 1126. It was not until the Order of April 11, 2003, when the Commission accepted the compliance filing, that DTE Energy could demonstrate actual injury. *See La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998). But while DTE Energy sought rehearing of the April 11 Order, its petition for review by the court challenges only the November 17, 2003 Rehearing Order. Because DTE Energy failed to identify the aggrieving order in its petition for review, the court cannot consider DTE's challenge to the Commission's November 17, 2003 Rehearing Order. *City of Oncoto Falls v. FERC*, 204 F.3d 1154, 1159-60 (D.C. Cir. 2000). Consequently, only Detroit Edison's petition for review of the March 13, 2003 Order and November 17, 2003 Rehearing Order are properly before the court.

**B.**

Section 313(b) of the FPA provides that "[n]o objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is

reasonable ground for failure to do so." 16 U.S.C. § 825*l*(b). This well-settled principle is "an unusually strict requirement that will not be ignored by the courts," even absent an objection by the Commission. *Wabash Valley Power Ass'n, Inc. v. FERC*, 268 F.3d 1105, 1114 (D.C. Cir. 2001); *see also High Country Res. v. FERC*, 255 F.3d 741, 745-46 (9th Cir. 2001).

While Detroit Edison sought rehearing of the March 13, 2003 Order, by which it is aggrieved, it did not argue in its petition for rehearing before the Commission that the Commission misapplied the seven-factor test. Instead, it raises the argument for the first time in its reply brief to the court. Detroit Edison fails to offer any grounds, let alone reasonable grounds, under section 313(b) of the FPA to excuse its failure to raise this argument before the Commission on rehearing. *See OMYA, Inc. v. FERC*, 111 F.3d 179, 181 (D.C. Cir. 1997). However, while the Commission argues in its brief on appeal that it applied the seven-factor test in the analysis of the March 13, 2003 Order, it did not expressly reference the test until the Rehearing Order. Even then the Commission did not state it was applying the seven-factor test, commenting only that its factual conclusions are "consistent with the seven-factor test." *November 17, 2003 Rehearing Order*, 105 F.E.R.C. at 62,084. This language is hardly consistent with the Commission's statement in Order No. 888 that it "will apply" its jurisdictional test. Order No. 888 at 31,980. Nevertheless, Detroit Edison acknowledged the applicability of the seven-test in footnote 42 of its petition for rehearing and could have challenged the Orders on that ground, citing *Detroit Edison* as support; instead it argued that, contrary to the Commission's findings, the evidence showed the DIG facilities were "dual-use" facilities and not subject to the Commission's exclusive jurisdiction. Detroit Edison's failure to challenge the seven-factor analysis earlier is understandable, in part, because, as counsel for the Commission stated during oral argument, Detroit Edison is not seeking to have the Commission apply the seven-factor test but

to have the Commission classify the facilities as "dual-use" subject to shared jurisdictional control. But the Commission's single-jurisdictional approach, identifying the primary function of a facility, has been judicially approved as a reasonable means of resolving regulatory ambiguity under section 201 of the FPA, *see New York v. FERC*, 535 U.S. 1; *TAPS*, 225 F.3d 667, and Detroit Edison's attempted collateral attack fails to argue why *TAPS* (and other precedents endorsing the jurisdictional test of Order No. 888) is not controlling. Whatever the reason for the omission, Detroit Edison has waived any argument that the Commission failed properly to apply its seven-factor test. *See High Country Res.*, 255 F.3d at 746-47; *OMYA*, 111 F.3d at 181.

Accordingly, the only issue within the court's jurisdiction is Detroit Edison's contention that the Commission's findings in support of its exclusive jurisdictional determination are unsupported by the record evidence and that the Commission therefore acted arbitrarily and capriciously in asserting exclusive jurisdiction over the facilities.

### III.

The court will uphold the Commission's orders unless they are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A); *see also Sithe/Independence Power Partners v. FERC*, 165 F.3d 944, 948 (D.C. Cir. 1999*); Transcontinental Gas Pipe Line Corp. v. FERC*, 54 F.3d 893, 898 (D.C. Cir. 1995). The Commission's findings of fact will be upheld if they are supported by substantial evidence in the record and the connection between the factual findings and conclusion drawn is apparent. *Jifry v. FAA*, 370 F.3d 1174, 1181 (D.C. Cir. 2004) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *Trans Alaska Pipeline Sys.*, 80 F.E.R.C. ¶ 63,015, 65,232-33 (1997). Substantial evidence includes such relevant evidence as a reasonable person may accept as proof of a conclusion. *Id.* (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477

(1981) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))).

In the March 13, 2003 Order, the Commission found that "the [f]acilities perform a transmission function and not a state-jurisdictional local distribution function because: (1) the [f]acilities are at a high-voltage level; (2) the Navarre-DIG line and the Baxter-DIG line are both 230 kV lines, and along with the DIG ring bus, form a 230 kV loop configuration; and (3) power flows into and out of the loop configuration." 102 F.E.R.C. at 61,906. The Commission found that the DIG, which is interconnected by the facilities to IT, is selling all its output at wholesale. It affirmed these findings on rehearing, explaining that:

> Although local distribution lines may exist within the Rouge Industrial Complex where Detroit Edison states that it serves retail customers, the record demonstrates that the [f]acilities are not local distribution facilities. . . . Power flows into and out of the [f]acilities, making them looped transmission facilities, i.e., not radial in character like those of local distribution facilities. With the DIG facility interconnected to the grid and given the network configuration, the [f]acilities have the capacity to transmit energy to other markets outside the geographical area.

*November 17, 2003 Rehearing Order*, 105 F.E.R.C. at 62,084. The Commission noted that Detroit Edison had previously characterized the Baxter 230 kV switch as transmission and that the Navarre line connects to the IT systems and thus to the transmission grid, such that it also operates as a looped 230 kV transmission line. *Id.* at 62,085.

As on appeal, Detroit Edison argued in its petition for rehearing that the Commission's jurisdictional conclusion was

wrong in two respects: First, the facilities perform dual functions, i.e., transmission and retail distribution, and second, because of this record showing, the facilities should be subject, at least in part, to shared jurisdiction by Michigan. Pointing to the "substantial evidence" provided in its pleadings, Detroit Edison argued that the facilities were constructed at the request of the DIG and Rouge complex customers to provide them with local-distribution service and that Detroit Edison continues to use the DIG facilities to provide retail-access service to end-use customers. It did not, however, dispute the Commission's factual findings that the facilities are high voltage and together with DIG's ring bus facilities (and facilities owned by Ford and Rouge at their plant sites at the Rouge complex) form a 230 kV loop configuration, such that power can flow into and out of the facilities. But, as on appeal, Detroit Edison instead argued that the Commission failed to address the evidence of the facilities' "dual-use" and that no record evidence contradicts Detroit Edison's showing.

In fact, on rehearing the Commission acknowledged that "local distribution lines may exist within the Rouge Industrial Complex where Detroit Edison states that it serves retail customers." *Id.* at 62,084. Critical to the Commission was that "the record," described in its March 13, 2003 Order, which was affirmed on rehearing, "demonstrates that the [f]acilities are not local distribution facilities." *Id.* Moreover, "neither Detroit Edison nor DTE has proffered any additional evidence on rehearing that shows otherwise," *id.*; nor did Detroit Edison dispute the factual findings on which the Commission relied for its jurisdictional conclusion. For these reasons, the Commission explained it disagreed with Detroit Edison's view that the facilities are "dual-use," rather than transmission facilities.

On appeal, Detroit Edison's reliance on the historical distribution function performed by the facilities is misplaced because the historical purpose or alleged intended use of the

facilities does not speak to the issue at hand, which is their present primary function. Detroit Edison's further contention that the looped nature of the facilities arises only because of the configuration of third-party facilities is forfeited because it failed to raise this argument before the Commission. *See supra* Part II B. Although Detroit Edison cites its rehearing request of the March 13, 2003 Order, its request never argued that the Commission should have found the DIG facility lines radial because the facilities were owned by others; rather, its argument was that if the Commission found the DIG facilities to be jurisdictional, the Commission should also find the Ford and Rouge facilities completing the loop jurisdictional as well to avoid discriminatory impact on Detroit Edison. In any event, whether Detroit Edison owns all the facilities in the loop is beside the point as the determinative question is whether the facilities it does own, as presently configured, perform a transmission function. Nothing in *Detroit Edison*, 334 F.3d 48, on which Detroit Edison now relies in claiming the Commission's findings are contrary to its holding, is to the contrary. That case is factually distinguishable, because the Commission, without reference to the seven-factor jurisdictional test of Order No. 888, had asserted jurisdiction over all facilities except those used exclusively in local distribution. *See id*. at 54.

Finally, there is no merit to Detroit Edison's contention that the Commission erred by failing to reopen the proceedings to consider the order of the Michigan Public Service Commission. In accordance with Order No. 888, the Commission defers to a state commission classification of facilities when such entities "'specifically evaluate the seven factor indicators and any other facts,'" in making their determination. *November 17, 2003 Rehearing Order*, 105 F.E.R.C. at 62,086 (citing Order No. 888 at 31,784 & n.4). Detroit Edison acknowledges that order did not purport to apply the seven-factor test of Order No. 888 or to reclassify the facilities. Hence, the Commission had no obligation to consider it.

Accordingly, we deny the petition for review.

*So ordered.*